IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CASE NUMBER: 1:21-cv-506

Tiffany Wade, individually, and on            )
behalf of all others similarly situated,      )
    *Plaintiff*,                                )
                                              )
vs.                                           )    *Defendants' and Counterclaim Plaintiff's*
                                              )    *Memorandum in Support of their*
                                              )    *Motion for Summary Judgment*
JMJ Enterprises, LLC and                      )
Traci Johnson Martin,                         )
    *Defendants*.                              )

---

## STATEMENT OF FACTS

Defendant JMJ Enterprises, LLC ("JMJ") is a non-profit agency for at-risk children and adolescents who have a primary diagnosis of mental illness or emotional disturbance. It also serves adults who have a primary diagnosis of mental retardation/developmental disabilities and mental illness, and who are able to receive services in their own home. JMJ consists of three (3) different group homes which are all located in Greensboro, North Carolina as follows;

    a)    Fresh Start Home for Children ("Fresh Start")- services only children and adolescents ages 10-17 years;

    b)    Palm House- services only male adults ages 18 and older; and

    c)    JGee's House- services only female adults ages 18 and older. (Exh. 1, Martin Depo. @ p. 19, line 16- p. 25, line 21).

Defendant Traci Martin ("Martin") has been the sole owner of JMJ since approximately 2008; however, she employs Qualified Professionals ("QP"), Program Directors, House Managers and Paraprofessionals to run the group homes. (Exh. 1, Martin depo. @ p. 32, lines 1-

1

4, 7-8). Martin is responsible for developing and implementing the policies and procedures for JMJ, and earns approximately $60,000 in salary annually. (Exh. 1, Martin depo. @ p. 38, lines 4-19; p. 173).

The state of North Carolina requires individuals to have training on CPR, First Aid, NCI, Medication Management, and certain other specific areas prior to working in any group home setting or any other healthcare facility in the state. The state required training is voluntary and may be obtained by an individual from various sources; however, without the training, an individual is not eligible for hire at any of the group homes run by JMJ. (Exh. 1, Martin depo. @ p. 95, line 10-p. 96, line 14). Individuals who have previously obtained the state required training prior to applying at JMJ are eligible to begin work in a group home immediately. (Exh. 1, Martin depo. @ p. 96, lines 16-25; p. 97, lines 1-14).

JMJ retains third-party vendors to offer the state required training at a church near its office, and interested individuals may voluntarily take the training. JMJ pays the vendor to provide the training but does not pay the individual for taking the training. (Exh. 1, Martin depo. @ p. 97, line 15- p. 98, line 3; p. 103, lines 5-16). The training is for the benefit of the individual since it can be used if they come to work for JMJ, or any other entity engaged in the business. (Exh. 1, Martin depo. @ p. 98, line 1-20). If an individual is already employed with JMJ, JMJ does pay that employee to attend renewal training courses throughout that employee's employment. (Exh. 1, Martin depo. @ p. 105, lines 15- 25; p. 106, line 23 -p. 107, line 1).

According to JMJ's records, Tiffany Wade ("Wade") applied for a paraprofessional position at Fresh Start on approximately February 12, 2021. (Exh. 2, Wade depo. exhibit 8). At the time of her application for employment with JMJ, Wade had not previously worked in the healthcare industry and therefore did not have the state required training. As a result, Wade

completed the training on February 23, 2021 at the church near JMJ's offices. (Exh. 2, Wade depo. @ p. 40, lines 2-23; depo. exhibits 1-5).[1]

Thereafter, on February 25, 2021, Wade began working as a non-exempt paraprofessional at Fresh Start, with a rate of pay of $9.00 per hour. (Exh. 2, Wade depo. @ p. 76, lines 11-13). Rhonda [Fender], a QP at Fresh Start, worked as Wade's supervisor, and in that capacity, she prepared Wade's work schedule. Wade was also supervised by "Jay"[2] Bell ("Bell") and "Traci's daughter"[3] toward the end of her employment. Wade's work schedule was typically written in a book which was located on the Fresh Start premises. (Exh. 2, Wade depo. @ p. 6, lines 8-12).

JMJ uses a payroll company called "Payroll Solutions" which provides payroll checks to its employees based upon information gathered and submitted by the QP's working within the three (3) group homes. The QPs gather information regarding the hours worked by the employees through a time clock system called "chronotek" which records the time an employee starts and ends his/her workday. Employees are required to use the telephone at the individual group home where they are scheduled to work to call in using a pre-assigned employee number and indicate the time they commence working; and, at the end of the day, they use the same telephone to call in to indicate the time their workday ends. That information is downloaded within the chronotek system. (Exh. 1, Martin depo. @ p. 63, line 21- p. 65, line 23, p. 86, line 18- p. 87, line 11). There is also a time correction log which is located and maintained by the QPs at each of the various group homes which is to be used if any corrections to work hours are made. (Exh. 1, Martin depo. @ p. 198, line 15- p. 200, line 20; p. 202, line 19-25).

---

[1] The trainings included Medication Management, CPR-First Aid, Seizure Management, Bloodborne Pathogens and National Crisis Intervention Plus; and, were conducted by Amanda Eggleston, RN, BSN with the Guilford County Department of Social Services and another third-party vendor, Daryl McFarland.
[2] "Jay" refers to JaSayah Bell.
[3] "Traci's daughter" refers to Tyler Martin.

Wade admits that she was informed and educated by her supervisors on how to use the chronotek system, as well as the time sheet adjustments. Wade testified that she would use the chronotek system at the beginning and end of her workday, and on at least one occasion she asked Rhonda to change her time through the use of a time sheet adjustment. (Exh. 2, Wade depo. @ p. 20-24, 30).

Shortly after beginning at JMJ, Wade needed money to pay rent and "take care of things." She explained to Martin that she had gone through an intense breakup and had other financial issues. Wade asked Martin for a payroll advance of $600.00, which Martin agreed to on March 25, 2021. (Exh. 2, Wade depo. @ p. 89, lines 20-24). According to Martin, the advancement was given with the understanding that subsequent hours worked by Wade in April would be deducted from the advance until it was repaid. (Exh. 3, Traci Martin Declaration; Exh. 2, Wade depo. @ p. 85, depo. exhibit 7).

On March 26, 2021, Bell texted the Fresh Start staff regarding a meeting that would take place on March 31 via ZOOM, or in-person for those who were at work at the Fresh Start group home during the time of the meeting. All staff was informed that, although the meeting was "mandatory", if they could not attend, they should let Bell know and provide reasons why they could not attend. The staff was informed that write ups would be given for unexcused absences. The purpose of the staff meeting was to discuss staff expectations, followed by individual job performance assessments. Wade responded on March 30, 2021 that she was unable to attend and would not cancel plans she had had for over two (2) weeks. Wade did not attend the meeting on March 31, 2021. All staff who attended the meeting were paid. (Exh. 4, Bell Declaration ¶5; Exh.5, Tyler Martin Declaration ¶5).

On April 1, 2021, Tyler Martin, QP and Bell met with Wade wherein Bell presented her with a verbal counseling written on a supervision form. The counseling was issued for insubordination related to Wade's unexcused absence from the March 31 meeting. During the meeting, Wade stated for the first time that she believed under federal law she was required to be paid for attending a mandatory meeting. Bell did not dispute that she should have been paid if she had attended the meeting; but since she didn't, she did not get paid. Bell later counseled with Traci Martin, after her meeting with Wade, and Martin confirmed that Bell was required to compensate any employees who attended the meeting who were not already clocked in for work. Wade did not suffer any adverse employment actions as a result of this verbal counseling and it was never used against her. Martin also advised Bell that the manner in which Bell had prepared the counseling for Wade was not the manner in which she would have preferred. (Exh. 4, Bell Declaration ¶6).

Wade worked at Fresh Start on April 1, 2, 3 and 4, 2021; however, on April 8, 2021 Bell received a text message from Wade stating that she was not feeling well and would be unable to come to work that day. (Exh. 4, Bell Declaration ¶9). On April 9th, Tyler Martin contacted Wade via telephone inquiring whether she was planning on working her scheduled shift. Wade said she was not because she still did not feel well. Tyler then talked to Wade about the importance of telling management in advance if she was planning on being absent for a scheduled shift so they could find coverage. Wade mentioned that she thought she had COVID and that she would schedule a COVID test the following week; however, Tyler informed her that they could have a nurse come to her location and give her a rapid test free of charge. Wade initially agreed, but later changed her mind and texted her resignation on that same day. (Exh. 5, Tyler Martin Declaration ¶¶6,7).

Wade filed this lawsuit against JMJ and Traci Martin in June, 2022, alleging that she was not compensated for 1) working overtime hours, 2) attending mandatory meetings and 3) attending trainings in violation of FLSA and NCWHA. Fifteen (15) former employees of JMJ, who Wade alleges are similarly situated to her, consented to become Opt-In Plaintiffs in this action. They are as follows[4]:

| NO. | NAME | LOCATION | DATE EMPLOYED | HOURLY PAY |
|---|---|---|---|---|
| 1 | Shamekia Allred-Clapp | Fresh Start | 02/18-11/20 | $10.00 |
| 2 | Tika Arnold | JGee's House | 03/20-11/21 | $8.25 |
| 3 | Marquashia Bradley | JGee's House | 02/21-05/21 | $9.00 |
| 4 | Shiquesta Brown | Fresh Start | 05/20-06/20 | $8.25 |
| 5 | Courtney Cherry | JGee's/Fresh Start | 02/20-01/21 | $10.00 |
| 6 | Sharon Cherry | Palm House | 11/20-02/22 | $8.75 |
| 7 | Anthony Fuller | JGee's House | 10/17- 11/21 | $8-$10.10 |
| 8 | Nahla Graham | JGee's Hose | 05/21-08/21 | $9.50 |
| 9 | Alex Johnson | Palm House | 05/19-11/20 | $9.00 |
| 10 | Lakita Johnson | Fresh Start | 09/20-11/20 | $7.50 |
| 11 | Amanda Johnston | JGee's | 11/21-01/22 | $10.00 |
| 12 | Alexis Levette | Palm House | 04/21-12/21 | $9.35 |
| 13 | Brandon Mapp | Palm House | 07/20-10/21 | $9.50 |
| 14 | Jennifer Russell | JGee's | 09/21 | $9.00 |
| 15 | Arianna West | Palm House | 09/21-01/22 | $10.00 |

---

[4] Exh. 3, Traci Martin Declaration. Payroll records and personnel files for each of the Opt-In Plaintiffs were produced to Plaintiffs during discovery.

Discovery closed in this action on December 22, 2022. Because neither the named Plaintiff nor the Opt-In Plaintiffs can produce sufficient evidence to support the claims against Martin and JMJ, the defendants are entitled to judgment as a matter of law.

STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is proper when: "(1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law." *Von Viczay v. Thoms*, 140 N.C.App. 737, 738, 538 S.E.2d 629, 630 (2000) (quotation omitted), aff'd per curiam, 353 N.C. 445, 545 S.E.2d 210 (2001). The moving party has the burden of showing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Garner v. Rentenbach Constructors, Inc*., 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, see *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C.Cir.2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position— "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but

7

must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987) (internal quotation marks and citation omitted).

ARGUMENT

I.   UNDERLINE_PLACEHOLDER WADE CANNOT PROVE THE ESSENTIAL ELEMENTS OF HER FLSA CLAIMS AGAINST DEFENDANT JMJ

A.   TRAINING

Wade alleges that on February 23, 2021, she attended a training class at a church in Greensboro with five (5) other employees where they learned First Aid, CPR and self-defense over a period of approximately four (4) hours without being compensated by JMJ. (ECF No. 53, ¶ 28). That fact forms the basis of Counts I and III of the Amended Complaint against the Defendants which alleges failure to pay minimum wages under FLSA on behalf of herself, as well as the FLSA collective. (ECF No. 53, ¶ 69).

The facts show that Wade received certifications for Medication Management, CPR-First Aid, Seizure Management, Bloodborne Pathogens and National Crisis Intervention Plus training on February 23, 2021. (Exh. 2, Wade depo. @ p. 64-75, exhibits 1-5).Wade admits that she took the training at the church near JMJ's offices which was **required before she could start working with the kids,**[5] **and that JMJ covered the cost of the training.** (Exh. 2, Wade depo. @ p. 40, line 2- p. 45, line 25).

"Time spent attending employer-sponsored lectures, meetings, and training programs is generally considered compensable." *Chao v. Tradesmen Int'l*, 310 F.3d 904, 907 (6th Cir.2002). However, training programs are not compensable if "(a) Attendance is outside of the employee's regular working hours; (b) Attendance is in fact voluntary; (c) The course, lecture, or meeting is

---

[5] The training Wade references is the state required training, per JMJ policy, individuals are not paid to attend. (Exh. 1, Martin depo. @ p. 284, line 13- p. 285, line 22; p. 288, line 20-p. 289, line 10). According to Wade, Rhonda told her that she would be paid for the training but Martin corrected that misstatement and informed Wade she would not be paid. (Exh. 2, Wade depo. @ p. 40-41, 42-44).

8

not directly related to the employee's job; and (d) The employee does not perform any productive work during such attendance." 29 C.F.R. § 785.27. Further, pursuant to § 785.31, "There are some special situations where the time spent in attending lectures, training sessions and courses of instruction is not regarded as hours worked. For example, an employer may establish for the benefit of his employees a program of instruction which corresponds to courses offered by independent bona fide institutions of learning. Voluntary attendance by an employee at such courses outside of working hours would not be hours worked even if they are directly related to his job or paid for by the employer."

In this case, the state of North Carolina has mandated a course of action for any individual wishing to gain employment in the healthcare industry. Among other things, that mandate requires that certain safety training courses be completed in order for an individual to be eligible to work in that field. JMJ provides a location, outside of its offices, for a third-party vendor to teach the courses prior to allowing an applicant to work on location at one of its group homes. An applicant may voluntarily take the courses offered by JMJ at the church, or may take the courses at a location or through another vendor of his/her choosing. Further, since the courses must be completed prior to receiving a work assignment at one of the group homes, the applicant is clearly not taking the courses during work hours. There is no specific time within which an applicant must take these courses, only that they must be completed in order to be eligible for a group home assignment.

No work is performed as part of the training sessions and the courses largely pertain to safety procedures, and not the actual job responsibilities of the paraprofessionals. The job responsibilities of the paraprofessionals were consistently described by Wade and the Opt-In Plaintiffs as involving daily life activities like getting dressed, bathing, household chores,

Case 1:21-cv-00506-LCB-JLW   Document 78   Filed 02/13/23   Page 9 of 24

watching movies, chatting and preparing meals. (Exh. 2, Wade depo. @ p. 17, lines 3-18; Exh. 24, Graham depo. @ p. 9, line 19- p. 10, line 20; Exh. 3, Traci Martin Declaration @ ¶10-11).

Finally, none of the plaintiffs provide evidence of any other type of training which was attended by them for which they believed they should have been compensated by JMJ.

Based on the foregoing, Counts I and III of the Amended Complaint should be dismissed with prejudice.

B.  <u>MANDATORY MEETINGS</u>

Wade alleges in her Amended Complaint that there was a mandatory meeting on March 31, 2021 which she could attend via Zoom or in-person at Fresh Start during which employees would not be paid. (ECF No. 53, ¶ 37-41). That fact forms the basis of Count I against the Defendants for failure to pay minimum wages under FLSA on behalf of herself, as well as the FLSA collective related to time associated with attending mandatory "meetings." (ECF No. 53, ¶ 70).

While it is undisputed that FLSA requires an employer to compensate its employees for attending mandatory meetings, the facts here show that Wade testified that she **DID NOT** attend the meeting so she did not expect to be paid. (Exh. 2, Wade depo. @ p.49-50). Further, Bell confirmed that the text message requiring the March 31 meeting was only sent to the staff of Fresh Start. (Exh. 4, Bell Declaration @ ¶5). Aside from this incident, neither Wade nor the Opt-In Plaintiffs offer any other evidence of having to attend any mandatory meetings during the course of three (3) years for which they were not compensated.

Based on the foregoing, FLSA and NCWHA claims related to mandatory meetings should be dismissed with prejudice.

C.  OVERTIME

Wade alleges in her Amended Complaint that on multiple occasions during her employment, she worked more than forty (40) hours in a week but was never properly compensated. Further, Wade alleges that she was not paid minimum wages and/or promised wages for all of the time worked during March and/or April, 2021. (ECF No. 53, ¶ 54-55). Those facts form the basis of Counts II and IV against the Defendants for alleged failure to pay minimum wages under FLSA on behalf of herself, as well as the FLSA collective. (ECF No. 53, ¶ 69).

To succeed on a claim for uncompensated overtime wages under FLSA, a plaintiff bears the burden of proving, as an element of the claim, that the employer had actual or constructive knowledge of the plaintiff's uncompensated overtime work. Fair Labor Standards Act of 1938 § 7, 29 U.S.C.A. § 207(a)(1). See *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996); *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988); *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986).

Because the plaintiffs in this case seek overtime compensation during the three-year limitations period, they must establish a willful violation of the FLSA by JMJ. Plaintiff bears the burden of proving willfulness, for purposes of determining applicable limitations period in FLSA action. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.; Portal–to–Portal Act of 1947, § 6(a), 29 U.S.C.A. § 255(a); 5 C.F.R. § 551.104. To establish a willful violation, the plaintiff "must show that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." *Id.* (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) ). "The Supreme Court has specifically stated that the word 'willful' refers to conduct that is voluntary, deliberate, and

11

intentional, and not merely negligent." In this case, there is absolutely no evidence of a willful violation of FLSA. Martin testified that she relied on the QP's at the various group homes to provide her with information pertaining to hours worked by their staff using the chronotek and time adjustment sheet data. The policy and practice involved a presentation of that data by the QPs to Martin, who subsequently provided the data to Payroll Solutions. Martin was unaware of individual hours worked by any employees because she was distanced from that process, with the various QPs of each group home having that specific and primary role.[6]

Martin acknowledges Wade[7] *may have* informed her that she had not been paid for one (1) or two (2) hours of overtime; however, this information was not provided until *after* this lawsuit was filed. (Exh. 1, Martin depo. @ p. 118, lines 8-23; p. 186, lines 16-22; p. 243, lines 5-19). Notwithstanding, Martin had given Wade a payroll ***advance*** of $600.00 on March 26, 2021 to be credited toward April's work schedule; and any overtime hours owed to Wade clearly would have been covered with that advance. (Exh. 1, Martin depo. @ p. 117, line 21- p. 118, line 7). As it turns out, Wade only worked four (4) days during the month of April before she voluntarily resigned prior to repaying the payroll advance.

Other than this particular incident, neither Wade nor the collective offer evidence of a failure by JMJ to compensate them for overtime hours. Based on the foregoing, Counts II and IV of the Amended Complaint should be dismissed with prejudice.

---

[6] "An employee who brings suit ... for unpaid minimum wages [and] unpaid overtime compensation ... has the burden of proving that he performed work for which he was not properly compensated." *Mt. Clemens*, 328 U.S. at 686–87, 66 S.Ct. 1187. However, "[t]he regulations implementing the FLSA mandate that the employer keep records of the 'hours worked each workday' by all employees." *Lee v. Vance Exec. Prot., Inc.*, 7 Fed.Appx. 160, 165 (4th Cir. 2001) (argued but unpublished). Here, JMJ utilized a time recording system called "chronotek", as well as backup time adjustment sheet to keep records of hours worked by all employees. The Plaintiffs have presented no evidence that the chronotek system was deficient in any way.

[7] Martin cannot recall whether Wade or her counsel informed her of the overtime issue, but it was well after Wade's resignation and after this litigation had commenced.

D.  RETALIATION

Wade alleges in Count V of her Amended Complaint that the Defendants terminated her employment in retaliation for opposing working without pay in violation of the FLSA. (ECF No. 53, ¶ 97).[8] In her deposition; however, she testified that she was retaliated against for not attending the mandatory meeting by being written up and placing her job in jeopardy. (Exh. 2, Wade depo. @ p. 51). Wade also testified that JMJ retaliated against her by filing a counterclaim against her in this lawsuit. (Exh. 2, Wade depo. @ p. 116).

The FLSA's anti-retaliation provision, 29 U.S.C. § 215(a)(3), provides that it shall be unlawful for "any person" to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act..." A plaintiff asserting a prima facie claim of retaliation under the FLSA must show that (1) he engaged in an activity protected by the FLSA; (2) he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action. *Wolf v. Coca–Cola Co*., 200 F.3d 1337, 1342–43 (11th Cir.2000); *Conner v. Schnuck Mkts., Inc*., 121 F.3d 1390, 1394 (10th Cir.1997); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008). The FLSA protects employees who have filed a complaint or instituted a proceeding under or related to the FLSA, have testified or are about to testify in any such proceeding, or who have served or are about to serve on an industry committee. 29 U.S.C. § 215(a)(3). The burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to an FLSA claim of retaliation. See, e.g., *Adair v.*

---

[8] Wade fails to prove she was constructively discharged. To establish constructive discharge, a plaintiff must be able to show that his former employer "deliberately ma[de] an employee's working conditions intolerable, and thereby force[d] him to quit." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985). In this case, there has been no evidence offered of intolerable working conditions.

13

*Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir.2006); *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir.2004).

An adverse employment action is a discriminatory act which "adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment." *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (quoting *Munday v. Waste Mgmt. of North America, Inc.*, 126 F.3d 239, 243 (4th Cir.1997)); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). A "downgrade of a performance evaluation could effect a term, condition, or benefit of employment" if it has a tangible effect on the terms or conditions of employment. *Von Gunten*, 243 F.3d at 867 (citing *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir.2000)). However, a poor performance evaluation "is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears*, 210 F.3d at 854. An evaluation merely causing a loss of prestige or status is not actionable. *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 972 (8th Cir.1999). In determining what constitutes an adverse employment action for Title VII purposes, the Fourth Circuit consistently has focused on "whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.1981). *Wagstaff v. City of Durham*, 233 F. Supp. 2d 739, 744 (M.D.N.C. 2002), aff'd, 70 F. App'x 725 (4th Cir. 2003) "[M]erely changing [a plaintiff's] hours does not constitute an adverse employment action." *Stout v. Kimberly Clark Corp.*, 201 F.Supp.2d 593, 603 (M.D.N.C.2002) (quoting *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998)).

Here, it is undisputed that Wade was not terminated by JMJ for any reason. Rather, she voluntarily resigned her employment via text message on April 9, 2021. Further, the write up

received by Wade which she alleges was retaliatory, had absolutely no effect on her continuing employment and compensation; and, Wade did not mention FLSA violations prior to receiving the write up. Therefore, Wade failed to prove that she engaged in protected activity and the employer subsequently caused her to suffer an adverse employment action. Even assuming *arguendo* Wade engaged in protected activity contemporaneously while she was receiving the write up from Bell and Tyler Martin, she fails to establish that she suffered an adverse employment action subsequent to engaging in that activity.

In *Wagstaff*, after Plaintiff missed a mandatory supervisors' meeting, her supervisor drafted a memorandum labeled "Notice of Disciplinary Action" concerning the incident and conducted a "coaching and counseling session" with Wagstaff. The *Wagstaff* Court held that the employer's evidence indicates that such coaching and counseling is not a disciplinary action, and the Plaintiff presented no evidence beyond the title of the initial memorandum to contradict this assertion. In *Wagstaff*, as in this action, the Plaintiff argued that the employer's action "could clearly have an adverse effect on the terms of Plaintiff's employment." The Court opined, "Plaintiff's burden, however, is to show that the warning ***did*** have such an effect." "Adverse employment action includes any retaliatory act or harassment if, but only if, that act or harassment results in an adverse effect on the 'terms, conditions, or benefits' of employment." (quoting *Munday*, 126 F.3d at 243). In *Wagstaff*, based on those reasons, the employer's motion for summary judgment on that claim was granted. The facts in *Wagstaff* are analogous to those here. Therefore, Wade's retaliation claim should be dismissed with prejudice.

II.     THE OPT-IN PLAINTIFFS CANNOT PROVE THE ESENTIAL ELEMENTS OF
        THEIR FLSA CLAIMS AGAINST DEFENDANT JMJ

During the discovery phase, the collective produced responses to written interrogatories which indicate they have no evidence, beyond general speculation, of FLSA violations by JMJ. (Exhibits 6-20). Depositions were taken of a sampling of the Opt-In Plaintiffs, and it is undoubtedly clear from the testimony of those witnesses that they have no evidence to support their FLSA and NCWHA claims, either collectively or individually. None of the opt-in plaintiffs identified a single meeting, or training, or shift where they worked hours in excess of their normal work hours for which they did not receive proper compensation.

For example, Tika Arnold worked as paraprofessional at JGee's House from approximately March 2020 through November 2021, earning $8.25 per hour. (Exh. 21, Arnold depo. @ p. 12, lines 9-23; p. 38, lines 18-22). Arnold received the state required training, but could provide no details about that training. (Exh. 21, Arnold depo. @ p. 24, line 5-p. 27, line 7). She was supervised by Valerie, Lisa and maybe, Anthony. Like the other plaintiffs, Arnold was familiar with the telephone time recording system and time book as the policy was communicated to her by her supervisors. (Exh. 21, Arnold depo. @ p. 13, lines 18- p. 15, line 20). Arnold testified that she complained to Valerie and Martin about not being properly paid because something "didn't look right about my paypcheck"; however, she cannot recall when or what didn't look right. (Exh. 21, Arnold depo. @ p. 16, lines 15-p. 19, line 7). Upon further questioning, Arnold was totally unable to provide any information regarding her claim that she was not paid for overtime hours.  (Exh. 21, Arnold depo. @ p. 21, line 24- p. 22, line 3).

She also testified that mandatory meetings took place at JGee's House and were conducted by her supervisors randomly; however, she admits that she did not attend all of them and suffered no penalty for failing to do so. Again, she has no evidence regarding when these

16

meetings occurred and she made no complaints regarding them to anyone. (Exh. 21, Arnold depo. @ p. 27, line 8- p. 30, line 25, p. 32, line 13- p. 34, line 15; p. 42, lines 8- p. 43, line 4). Ultimately, Arnold voluntarily resigned employment with JMJ. (Exh. 21, Arnold depo. @ p. 37, line 13- p. 38, line 17).

Sharon Cherry worked as a paraprofessional at Palm House from November 2020 to February 2022. (Exh. 22, Cherry depo. @ p. 7, lines 13-24). Cherry confirmed that she too was aware of the company's time recording system. (Exh. 22, Cherry depo. @ p. 9, lines 5-21). She also confirmed that the QP working at Palm House was responsible for monitoring the time recording system. (Exh. 22, Cherry depo. @ p. 10, lines 3-22). Like some of the other Opt-In Plaintiffs, Cherry testified that she had to stay over at work past her normal work hours when people didn't show up on time for work but she did not keep up with how often that happened. (Exh. 22, Cherry depo. @ p. 10, line 23- p. 11, line 20).

Unlike Wade and others, Cherry was not required to take state required training prior to working at Palm House because she already had experience and training which was transferable. Cherry never complained about having to attend mandatory meetings, nor for failing to be compensated for attending them, which she testified were held at Palm House and the church. (Exh. 22, Cherry depo. @ p. 12, line 23-p. 14, line 1; p. 14, lines 18-23; Cherry depo. @ p. 15, line 3- p. 16, line 5).

Anthony Fuller worked as a paraprofessional, then House Manager, at Palm House and JGee's from October 31, 2017 through the end of 2021, when he voluntarily resigned. (Exh. 23, Fuller depo. @ p. 7, lines 12-p. 8, line 23). He started off at $8.00 per hour and ended at $10.10 per hour. (Exh. 23, Fuller depo. @ p. 35, lines 9-13;Fuller depo. @ p. 33, line 17-19). Alex Young, Eric Bradley and Quinton Fuller worked as his supervisors and QP's during his

17

employment. (Exh. 23, Fuller depo. @ p. 11, line 7- p. 12, line 21). Fuller admits that he signed a document dated May 28, 2019 stating that JMJ had paid him all overtime owed to him.[9] (Exh. 23, Fuller depo. @ p. 18, lines 15-25; Fuller depo. exhibit 1). Fuller continued to work at JMJ thereafter and never made any other claims with the DOL regarding overtime pay. (Exh. 23, Fuller depo. @ p. 20, lines 16-25).

Like the other Opt-In Plaintiffs, Fuller was aware of JMJ's time recording system. (Exh. 23, Fuller depo. @ p. 22, line 21-p. 23, line 22; p. 24, line 23- p. 25, line 12). He testified that he was also required to attend mandatory meetings sometimes off the clock, but like the other Opt-In Plaintiffs, cannot recall when. (Exh. 23, Fuller depo. @ p. 28, line 1-p. 29, line 7; Fuller depo. @ p. 29, lines 8-16; p. 30, line 17-p. 31, line 6).

Nahla Graham worked at JGee's House from May '21 through August '21, and testified that she complained to her supervisor, Eric Bradley, about an incorrect paycheck. (Exh. 24, Graham depo. @ p. 7-9, 15). According to her, she was denied a full paycheck, but did not complain to Martin and does not recall when the incident occurred. Like the other Opt-In Plaintiffs, Graham was aware of the manner in which she was suppose to record her work hours, and admitted that she may have failed to properly record her work time on a number of occasions. (Exh. 24, Graham depo. @ p. 20-23, p. 24, lines 1-9). Graham testified that she did not receive overtime pay for excess hours worked, but did not have specific dates of when that occurred. (Exh. 24, Graham depo. @ p. 15-19; Graham depo. @ p. 19, lines 9-10).

Graham testified that she was required to attend training classes at the church for which she did not receive compensation. (Exh. 24, Graham depo. @ p. 28, lines 5-25; p. 33, line 18- p. 36, line 25; p. 37, lines 1-24). However, upon review of her personnel file, Graham was in a

---

[9] NC Department of Labor conducted an audit of JMJ in 2020 and determined that employees were required to be paid for "sleeping" hours. This affected several employees, including Anthony Fuller.

much different situation than Wade. Graham applied for employment at JMJ on May 15, 2021 and because she already maintained valid state training certifications, she was able to start working immediately. Graham was oriented by Traci Martin with the clients at JGee's on May 15 and 16, 2021. She subsequently received renewal training through a third-party vendor for the state required training on June 9 and July 8, 2021. All of the training was documented through "chronotek" and Graham was compensated for the hours spent during this period of time. (Exh. 3, Traci Martin Declaration @ ¶13 and attached exhibit A).

Finally, Graham testified that she was required to attend three (3) or four (4) mandatory meetings for which she was not compensated; however, she cannot recall when. She further testified that she did not complain to anyone about not being compensated for attendings these meetings. (Exh. 24, Graham depo. @ p. 39, line 14- p. 41, line 12).

Amanda Johnston worked as a paraprofessional at JMJ between November 2021 and January 2022 earning $12.00 per hour. (Exh. 25, Johnston depo. @ p. 9, lines 20-24; p. 19, line 25- p. 20, line 3). Johnston was aware of the time recording system and recorded her work time in a notebook while she was waiting to get a "number." (Exh. 25, Johnston depo. @ p. 15, lines 4-24). She admits that she "may have" talked to Martin about pay issues once, but has never met Martin in person. (Exh. 25, Johnston depo. @ p. 16, lines 14-24, p. 18, lines 1-6).

Johnston, unlike Wade, already had state required training from another source and was able to transfer that training to JMJ. (Exh. 25, Johnston depo. @ p. 20, lines 17- p. 23, line 18). Further, she was not required to attend any mandatory meetings. (Exh. 25, Johnston depo. @ p. 23, line 25- p. 24, line 10). Johnston confirmed that she does not know Wade,  (Exh. 25, Johnston depo. @ p. 37, lines 18-22) and has no information about how much money she thinks JMJ owes her. (Exh. 25, Johnston depo. @ p. 34, line 5-p. 35, line 6; 39, lines 11- 14).

19

Based on the foregoing, all of the claims brought by the collective should be dismissed with prejudice.

## III.    ALL CLAIMS AGAINST TRACI MARTIN SHOULD BE DISMISSED

Wade has alleged the same FLSA and NCWHA claims against both JMJ, her undisputed employer, and Traci Martin, individually. However, she does not produce any evidence that any potential corporate liability should extend to Martin.

Piercing the corporate veil sets aside that general rule and allows a plaintiff to impose legal liability for a corporation's obligations, or for torts committed by the corporation, upon some other company or individual that controls and dominates a corporation. See *Henderson v. Sec. Mortg. & Fin. Co*., 273 N.C. 253, 160 S.E.2d 39 (1968). The decision to pierce a corporate veil and expose those behind the corporation to liability is one that is to be taken reluctantly and cautiously. *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co*., 540 F.2d 681, 685 (4th Cir. 1976).; *in re Cnty. Green Ltd. P'ship*, 604 F.2d 289, 292 (4th Cir. 1979). "The general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg*., LLC, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008) (citation omitted). The burden of establishing a basis for the disregard of the corporate fiction rests on the party asserting such claim. *Coryell v. Phipps* (5th Cir. 1942), 128 F.2d 702, 704, *aff*., 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

Here, even though Martin is the sole owner of JMJ, there just simply are no facts that warrant extending any potential liability to her individually. "The Court recognizes the principle that ownership of all or almost all of the shares of a corporation by one individual does not afford sufficient ground for disregarding the corporate entity, *Ruberoid Co. v. North Texas Concrete Co*., 193 F.2d 121 (5th Cir. 1951). All acts alleged to have occurred involving Martin were acts

20

done within the scope of her employment with JMJ and there is no evidence that she performed acts outside the scope of her authority to the benefit of herself.

Based on the foregoing, all claims against Traci Martin individually should be denied.

## IV.  JMJ'S BREACH OF CONTRACT COUNTERCLAIM SHOULD BE GRANTED

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C.App. 19, 26, 530 S.E.2d 838, 843 (2000). "In order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Long v. Long*, 160 N.C.App. 664, 668, 588 S.E.2d 1, 4 (2003) (emphasis added). In order to prevail on a claim of breach of contract, the movant "must show that the alleged breach caused him injury." *Menzel v. Metrolina Anesthesia Assoc.*, 66 N.C.App. 53, 59, 310 S.E.2d 400, 404 (1984) (citation omitted). See also *Ausley v. Bishop*, 133 N.C. App. 210, 219, 515 S.E.2d 72, 79 (1999) and *Crockett Cap. Corp. v. Inland Am. Winston Hotels, Inc.*, No. 08 CVS 0691, 2011 WL 1679431, at *20 (N.C. Super. Feb. 28, 2011).

In the present case, it is undisputed that Wade and JMJ had an agreement that Wade was given a payroll advance for the month of April, 2021 of $600.00 in exchange for Wade's promise to repay through hours worked. Wade resigned without working sufficient hours to earn the advance. The written agreement and its designation of "payroll advance" clearly demonstrates that the advance was not a gift, and was not based on a personal loan from Martin. As a result of Wade's failure to perform, the purpose of the agreement was defeated and JMJ suffered a financial loss of $600.00 Based on the foregoing, summary judgment in favor of the Counterclaim Plaintiff should be entered on its Breach of Contract claim.

21

<u>CONCLUSION</u>

Defendants pray the Court that it GRANT their motion for summary judgment as to all claims brought by the Plaintiffs; and GRANT the Counterclaim Plaintiff's motion for summary judgment on its Breach of Contract claim.

This the 13th day of February, 2023.

GRAY NEWELL THOMAS, LLP.

BY: <u>/s/ Angela Gray</u>
   Angela Newell Gray
   7 Corporate Center Court, Suite B
   Greensboro, NC 27408
   Telephone: (336) 285-8151
   Facsimile: (336) 458-9359
   Email:  angela@graynewell.com
   *Attorney for Defendants/Counterclaim Plaintiff*
   NC Bar # 21006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CASE NUMBER: 1:21-cv-506

Tiffany Wade, individually, and on )
behalf of all others similarly situated, )
    *Plaintiff*, )
     )
vs. )     *Certificate of Service*
     )
     )
JMJ Enterprises, LLC and )
Traci Johnson Martin, )
    *Defendants*. )

I, Angela Newell Gray, Attorney for the Defendants, do hereby certify that I filed the foregoing Defendants' Memorandum in Support of Motion for Summary Judgment with the Clerk of Court using the CM/ECF electronic filing service which will send electronic notification to the following CM/ECF participants: L. Michelle Gessner at michelle@mgessnerlaw.com.

This the 13th day of February, 2023.

GRAY NEWELL THOMAS, LLP.

BY:    /s/ Angela Gray
        Angela Newell Gray
        7 Corporate Center Court, Suite B
        Greensboro, NC 27408
        Telephone:    (336) 285-8151
        Facsimile:    (336) 458-9359
        Email:    angela@graynewell.com
        *Attorney for Defendants/Counterclaim Plaintiff*
        NC Bar # 21006

23

VERIFICATION OF COMPLIANCE WITH LOCAL RULE 7.3(d)(1)

The undersigned hereby verifies that the foregoing brief does not exceed 6,250 words.

This the 13th day of February, 2023.

/s/ Angela Gray
Angela Gray
N.C. Bar. No. 21006
7 Corporate Center Court, Suite B
Greensboro, NC 27408
Telephone: 336-285-8151
Facsimile: 336-458-9359
Email: angela@graynewell.com