# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION
## CIVIL ACTION NO.: 1:21-cv-00506-LCB-JLW

| | | |
|---|---|---|
| Tiffany Wade, on behalf of herself and all others similarly situated,<br>    *Plaintiff*, | ) ) ) ) ) | ***DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 23 MOTION*** |
| vs. | ) ) ) | |
| JMJ Enterprises, LLC and Traci Martin,<br>    *Defendants*. | ) ) | |

## STATEMENT OF PERTINENT FACTS

Plaintiff Tiffany Wade ("Wade") filed an Amended Complaint against JMJ and Traci Martin in June, 2022 on behalf of herself and others similar situated, alleging that she was not compensated for 1) working overtime hours, 2) attending mandatory meetings and 3) attending trainings in violation of FLSA and NCWHA. [ECF No. 53].[1] Of the ninety-seven (97) similarly situated potential class members identified, fifteen (15) former employees of JMJ consented to become Opt-In Plaintiffs in this action. They are as follows:[2]

| NO. | NAME | LOCATION | DATE EMPLOYED | HOURLY PAY |
|---|---|---|---|---|
| 1 | Shamekia Allred-Clapp | Fresh Start | 02/18-11/20 | $10.00 |
| 2 | Tika Arnold | JGee's House | 03/20-11/21 | $8.25 |
| 3 | Marquashia Bradley | JGee's House | 02/21-05/21 | $9.00 |

---

[1] On January 10, 2022, this Court conditionally certified a collective action whose potential class consisted of non-exempt hourly employees of JMJ Enterprises, LLC and/or Traci Martin between June 1, 2018 and the present. [ECF No. 21].

[2] Exhibit 3, Traci Martin Declaration. All plaintiffs were paid more than the minimum wage under state and federal laws.

| | | | | |
|---|---|---|---|---|
| 4 | Shiquesta Brown | Fresh Start | 05/20-06/20 | $8.25 |
| 5 | Courtney Cherry | JGee's/FS | 02/20-01/21 | $10.00 |
| 6 | Sharon Cherry | Palm House | 11/20-02/22 | $8.75 |
| 7 | Anthony Fuller | JGee's House | 10/17- 11/21 | $8-$10.10 |
| 8 | Nahla Graham | JGee's Hose | 05/21-08/21 | $9.50 |
| 9 | Alex Johnson | Palm House | 05/19-11/20 | $9.00 |
| 10 | Lakita Johnson | Fresh Start | 09/20-11/20 | $7.50 |
| 11 | Amanda Johnston | JGee's | 11/21-01/22 | $10.00 |
| 12 | Alexis Levette | Palm House | 04/21-12/21 | $9.35 |
| 13 | Brandon Mapp | Palm House | 07/20-10/21 | $9.50 |
| 14 | Jennifer Russell | JGee's | 09/21 | $9.00 |
| 15 | Arianna West | Palm House | 09/21-01/22 | $10.00 |

According to JMJ's records, Wade applied for a paraprofessional position at Fresh Start on approximately February 12, 2021. (Exh. 2, Wade depo. exhibit 8). At the time of her application for employment with JMJ, Wade had not previously worked in the healthcare industry and therefore did not have the state required training.[3] As a result, Wade completed the training on February 23, 2021 (Exh. 2, Wade depo. @ p. 40, lines 2-23; depo. exhibits 1-5) and thereafter, on February 25, 2021, began working as a non-exempt paraprofessional at Fresh Start, with a rate of pay of $9.00 per hour. (Exh. 2, Wade depo. @ p. 76, lines 11-13).

JMJ uses a payroll company called "Payroll Solutions" which provides payroll checks to its employees based upon information gathered and submitted by the Qualified Professionals ("QP's") working within the three (3) group homes. The QPs gather information regarding the

---

[3] A fuller discussion of the state required training in contained in the Defendants Memorandum in Support of their Motion for Summary Judgment. [ECF No. 78].

hours worked by the employees through a time clock system called "chronotek" which records the time an employee starts and ends his/her workday. Employees are required to use the telephone at the individual group home where they are scheduled to work to call in using a pre-assigned employee number and indicate the time they commence working; and, at the end of the day, they use the same telephone to call in to indicate the time their workday ends. (Exh. 1, Martin depo. @ p. 63, line 21- p. 65, line 23, p. 86, line 18- p. 87, line 11). There is also a time correction log which is located and maintained by the QPs at each of the various group homes which is to be used if any corrections to work hours are made. (Exh. 1, Martin depo. @ p. 198, line 15- p. 200, line 20; p. 202, line 19-25). Wade and the opt-in plaintiffs admit that they were informed, and aware of the chronotek system, as well as the time sheet adjustments. (Exh. 2, Wade depo. @ p. 20-24, 30).[4]

Shortly after beginning at JMJ, Wade asked Martin for a payroll advance of $600.00, which Martin agreed to on March 25, 2021. (Exh. 2, Wade depo. @ p. 89, lines 20-24). According to Martin, the advancement was given with the understanding that subsequent hours worked by Wade in April would be deducted from the advance until it was repaid. (Exh. 3, Traci Martin Declaration; Exh. 2, Wade depo. @ p. 85, depo. exhibit 7).

On March 26, 2021, JaSayah Bell ("Bell"), Wade's supervisor, texted the Fresh Start staff regarding a mandatory meeting that would take place on March 31. Staff was informed that, although the meeting was "mandatory", if they could not attend, they should let Bell know and provide reasons why they could not attend. The staff was informed that write ups would be given for unexcused absences. The purpose of the staff meeting was to discuss staff expectations,

---

[4] (Exh. 21, Arnold depo. @ p. 13, lines 18- p. 15, line 20; Exh. 22, Cherry depo. @ p. 9, lines 5-21; Exh. 23, Fuller depo. @ p. 22, line 21-p. 23, line 22; p. 24, line 23- p. 25, line 12; (Exh. 24, Graham depo. @ p. 20-23, p. 24, lines 1-9; Exh. 25, Johnston depo. @ p. 15, lines 4-24).

followed by individual job performance assessments. Wade did not attend the meeting on March 31, 2021; however, all staff who attended the meeting were paid. (Exh. 4, Bell Declaration ¶5; Exh.5, Tyler Martin Declaration ¶5).

On April 1, 2021, Tyler Martin, QP and Bell met with Wade wherein Bell presented her with a verbal counseling written on a supervision form. The counseling was issued for insubordination related to Wade's unexcused absence from the March 31 meeting. During the meeting, Wade stated for the first time that she believed under federal law she was required to be paid for attending a mandatory meeting. Bell did not dispute that she should have been paid if she had attended the meeting; but since she didn't, she did not get paid. (Exh. 4, Bell Declaration ¶6). Thereafter, Wade worked at Fresh Start on April 1, 2, 3 and 4, 2021; however, on April 9th, Wade texted her resignation to Tyler Martin effective immediately. (Exh.5, Tyler Martin Declaration ¶10).

During the discovery phase of this litigation, the collective produced responses to written interrogatories which indicate they have no evidence, beyond general speculation, of FLSA or NCWHA violations by JMJ. (Exhibits 6-20). Depositions were taken of a sampling of the Opt-In Plaintiffs, and none of them identified a single meeting, or training, or shift where they worked hours in excess of their normal work hours for which they did not receive proper compensation.

For example, Tika Arnold worked as paraprofessional at JGee's House from approximately March 2020 through November 2021, earning $8.25 per hour. (Exh. 21, Arnold depo. @ p. 12, lines 9-23; p. 38, lines 18-22). Arnold received the state required training, but could provide no details about that training. (Exh. 21, Arnold depo. @ p. 24, line 5-p. 27, line 7). Arnold testified that she complained about not being properly paid because something "didn't look right about my papercheck"; however, she cannot recall when or what didn't look right.

(Exh. 21, Arnold depo. @ p. 16, lines 15-p. 19, line 7). Upon further questioning, Arnold was totally unable to provide any information regarding her claim that she was not paid for overtime hours. (Exh. 21, Arnold depo. @ p. 21, line 24- p. 22, line 3).

She also testified that mandatory meetings took place at JGee's House and were conducted by her supervisors randomly; however, she admits that she did not attend all of them and suffered no penalty for failing to do so. Again, she has no evidence regarding when these meetings occurred and she made no complaints regarding them to anyone. (Exh. 21, Arnold depo. @ p. 27, line 8- p. 30, line 25, p. 32, line 13- p. 34, line 15; p. 42, lines 8- p. 43, line 4). Ultimately, Arnold voluntarily resigned employment with JMJ. (Exh. 21, Arnold depo. @ p. 37, line 13- p. 38, line 17).

Sharon Cherry worked as a paraprofessional at Palm House from November 2020 to February 2022. (Exh. 22, Cherry depo. @ p. 7, lines 13-24). Like some of the other Opt-In Plaintiffs, Cherry testified that she had to stay over at work past her normal work hours when people didn't show up on time for work but she did not keep up with how often that happened. (Exh. 22, Cherry depo. @ p. 10, line 23- p. 11, line 20).

Unlike Wade and others, Cherry was not required to take state required training prior to working at Palm House because she already had experience and training which was transferable. Cherry never complained about having to attend mandatory meetings, nor for failing to be compensated for attending them. (Exh. 22, Cherry depo. @ p. 12, line 23-p. 14, line 1; p. 14, lines 18-23; Cherry depo. @ p. 15, line 3- p. 16, line 5).

Anthony Fuller worked as a paraprofessional, then House Manager, at Palm House and JGee's from October 31, 2017 through the end of 2021, when he voluntarily resigned. (Exh. 23, Fuller depo. @ p. 7, lines 12-p. 8, line 23). He started off at $8.00 per hour and ended at $10.10

per hour. (Exh. 23, Fuller depo. @ p. 35, lines 9-13;Fuller depo. @ p. 33, line 17-19). Fuller testified that he was required to attend mandatory meetings sometimes off the clock, but like the other Opt-In Plaintiffs, cannot recall when. (Exh. 23, Fuller depo. @ p. 28, line 1-p. 29, line 7; Fuller depo. @ p. 29, lines 8-16; p. 30, line 17-p. 31, line 6).

Nahla Graham worked at JGee's House from May '21 through August '21, and testified that she was denied a full paycheck, but did not complain to Martin and does not recall when the incident occurred. Graham testified that she did not receive overtime pay for excess hours worked, but did not have specific dates of when that occurred. (Exh. 24, Graham depo. @ p. 15-19; Graham depo. @ p. 19, lines 9-10).

Graham also testified that she was required to attend training classes at the church for which she did not receive compensation. (Exh. 24, Graham depo. @ p. 28, lines 5-25; p. 33, line 18- p. 36, line 25; p. 37, lines 1-24). However, upon review of her personnel file, Graham was in a much different situation than Wade. Graham applied for employment at JMJ on May 15, 2021 and because she already maintained valid state required training certifications, she was able to start working immediately. Graham was oriented with the clients at JGee's on May 15 and 16, 2021. She subsequently received renewal training through a third-party vendor for the state required training on June 9 and July 8, 2021. All of the training was documented through "chronotek" and Graham was compensated for the hours spent during this period of time. (Exh. 3, Traci Martin Declaration @ ¶13 and attached exhibit A).

Finally, Graham testified that she was required to attend three (3) or four (4) mandatory meetings for which she was not compensated; however, she cannot recall when. She further testified that she did not complain to anyone about not being compensated for attendings these meetings. (Exh. 24, Graham depo. @ p. 39, line 14- p. 41, line 12).

Amanda Johnston worked as a paraprofessional at JMJ between November 2021 and January 2022 earning $12.00 per hour. (Exh. 25, Johnston depo. @ p. 9, lines 20-24; p. 19, line 25- p. 20, line 3). She admits that she "may have" talked to Martin about pay issues once, but has never met Martin in person. (Exh. 25, Johnston depo. @ p. 16, lines 14-24, p. 18, lines 1-6).

Johnston, unlike Wade, already had state required training from another source and was able to transfer that training to JMJ. (Exh. 25, Johnston depo. @ p. 20, lines 17- p. 23, line 18). Further, she was not required to attend any mandatory meetings. (Exh. 25, Johnston depo. @ p. 23, line 25- p. 24, line 10).

<u>ARGUMENT</u>

<u>PLAINTIFF CANNOT MEET THE REQUIREMENTS UNDER RULE 23 FOR CERTIFICATION OF A CLASS ACTION UNDER NCWHA</u>

To be certified, a proposed class must satisfy Rule 23(a) and one of the three sub-parts of Rule 23(b). *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir.2003). The Plaintiffs here are relying on subpart (3). Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." It is the plaintiff who bears the burden of showing that the class does comply with Rule 23. *Windham v. Am. Brands, Inc*., 565 F.2d 59, 65 n. 6 (4th Cir.1977) (en banc) ("It is well-settled in this jurisdiction that the proponent of class certification has the burden of establishing the right to such certification under Rule 23.") In this case, the Court certified a "conditional class" pursuant to the FLSA[5] prior to discovery; however, the requirements for certifying a class under Rule 23(a) are substantially different. Having completed discovery, the Court now has a factual basis for denying the Plaintiff's Rule 23(a) motion.

---

[5] The Defendants Motion to Decertify the FLSA Class is filed under separate cover.

7

Pursuant to Rule 23(a), one or more members of a class may sue or be sued as representative parties on behalf of all members *only if*: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. A class action may be maintained if Rule 23(a) is satisfied <u>and</u> if: (b)(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

In the present case, Wade alleges the Defendants violated North Carolina's Wage and Hour Act ("NCWHA") by failing to pay all wages earned as promised. [ECF. No. 53, ¶2, 61-65]. Wade, who has been identified as the named representative of the Rule 23(a) class, argues that the putative class members are hourly paraprofessionals who were not paid as promised, or for all hours worked. Of the ninety-seven (97) potential class members under the FLSA claims, the facts show that only fifteen (15) opted into this litigation. The facts further show that all Plaintiffs do not share similar work experiences and requirements related to attending training, mandatory meetings and overtime hours. For those reasons, the fundamental basis for applying Rule 23(a) is absent.

As to the second and third elements under Rule 23(a), there are few, if any, questions of law or fact common to the class, and the claims or defenses of Wade *are not typical* of the claims or defenses of the class. The commonality and typicality requirements of Rule 23 are interrelated and tend to overlap. Commonality is satisfied by showing "a common nucleus of operative fact." Typicality is met if the class representative's claim "arises from the same event or practice or

8

course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Blitz v. Agean, Inc.*, 197 N.C. App. 296, 306, 677 S.E.2d 1, 8 (2009). In the present case, Wade's evidence shows that the only mandatory meeting which gives rise to the allegations of FLSA and NCWHA violations was the meeting that occurred on March 31, 2021 which only affected the staff of Fresh Start. None of the class members attended the meeting, including Wade; and the evidence shows that all staff who attended the March 31, 2021 meeting, were compensated.

There is no evidence of commonality with regard to training. The facts show that the type of, and need for training is very much individualized based on the background of the applicant. Furthermore, the company policy regarding non-compensation for state required training does not violate FLSA and NCWHA since the state required training is voluntary and must be completed before an individual is eligible for hire. Per the JMJ policy, an employee is compensated for any time spent in training taken after hire, such as renewal of certification training.

Unlike any of the putative class members, Wade has been countersued by JMJ for failing to repay a payroll cash advance prior to her resignation. Thus, she is required to defend a claim, potentially resulting in additional litigation costs, which would be different from the putative class members. Furthermore, unlike the other putative class members, Wade is the only one with a retaliation claim and who has the burden of proving additional elements. These facts, unique to Wade, create a potential conflict of interest between herself and the members of the class; and demonstrate a lack of commonality and typicality.

Finally, Wade cannot establish that she will fairly and adequately represent the interests of all members of the class. Wade filed a declaration with this Court in support of her motion to

certify the collective class on August 20, 2021. [ECF No. 9-1]. During her deposition, when asked the names of the co-workers she was referencing who were allegedly similarly situated to her and would be members of the putative class, Wade testified, "I don't remember their names. *They* were not me. I don't know. I didn't care too much. …My concern was doing my job, not the ability at which others performed theirs. …**I was not personally invested in them or their lives**… . (Wade depo. @ p. 59, line 17- p. 61, line 17). When asked if she had spoken with any of the other opt-in plaintiffs in this case, Wade confirmed that she had not. (Wade depo, @ p. 16, lines 1-9).[6]

Wade also has invested little, if any, time on this litigation. Her testimony states;

Q.      Ms. Wade, have you reviewed any documents that were produced in this case?

A.      Briefly, but not-- **my time has been spent doing other things. I'm extremely busy. My move to Michigan was not just for fun. I'm pursuing a job out there and, to be entirely frank with you, I'm completely inundated with other stuff at the moment**, which is why I've hired a lawyer, so that she can keep track of those things for me. (Wade depo. @ p. 54, line 22- p. 55, line 5).

Based on the foregoing, Wade cannot fairly and adequately represent the entire class because of distance, time restraints and lack of interest.

In *Harrison vs. Wal-Mart Stores, Inc*., 170 N.C. App. 545 (2005), the Court of Appeals opined that with regard to the Plaintiffs wage and hour claim, the requisite proof "will involve an analysis of time records for each putative class member and investigation into any unique issues that may have been present in each particular store at the time of the alleged violations." Therefore, class certification was properly denied. In the present case, because no specific dates, hours, times or locations have been testified to by the class regarding NCWHA violations, this

---

[6] Johnston confirmed that she does not know Wade,  (Exh. 25, Johnston depo. @ p. 37, lines 18-22) and has no information about how much money she thinks JMJ owes her. (Exh. 25, Johnston depo. @ p. 34, line 5-p. 35, line 6; 39, lines 11- 14).

Court would necessarily have to undertake an investigation into each and every hour that was worked by each and every class member at each of the three (3) JMJ locations to determine if a violation occurred. FLSA does not require that of the Court. Rather, it requires the aggrieved parties to point to specific evidence, not speculation, which shows a violation of the law by the defendant. Because the plaintiffs cannot meet that burden, class certification should be denied.

Finally, Rule 23(g)(1) states in pertinent part that a court that certifies a class must appoint class counsel. In appointing class counsel, the court: (A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Section (B) allows the Court to consider *any other matter* pertinent to counsel's ability to fairly and adequately represent the interests of the class. The facts in the present case show that Atty. Gessner should not be appointed class counsel because her behavior during the course of litigation evidences either a lack of knowledge of the applicable law and rules, or a conscience disregard for them.

After discovery disputes were argued on November 10, 2022 before the magistrate judge, this Court issued a text order instructing the parties to conduct subsequent depositions in compliance with Local Rule 30.1. Local Rule 30.1(2) states that Counsel shall not make objections or statements which might suggest an answer to a witness. Counsels' statements when making objections should be succinct, stating the basis of the objection and nothing more. In the present case, Gessner repeatedly and egregiously violated the Court order and the local rule during the deposition of the named plaintiff, as well as the depositions of the opt-in plaintiffs.

11

For example, when Wade was asked to clarify a previous answer, the following exchange

occurred:

Q[7].     Okay. So in terms of the supervisor being responsible for recording what time it was when you actually left, your testimony is that that would be based on what you told the supervisor of when you left, right?

**GESSNER:    Object to form, mischaracterizes her testimony. She didn't say just supervisor, she said multiple times a supervisor or someone in authority, including Ms. Martin, so you've now restated testimony that's inaccurate. (Wade depo. @ p. 15, lines 11-22).**

Q.     Okay. And did you ever write down physically what time you left and keep it in some type of log for yourself?

A.     No.

Q.     All right. So you didn't keep a log in any capacity of your actual times that you worked; is that right?

**GESSNER:    Object to the form. Her memory is evidence and she is entitled to testify as to her memory. So when you say log, you need to be more specific. In writing or in her memory? Counsel, you continuously ask questions that literally have no foundation, that in no way define—what do you mean by log, written or otherwise? You need to be more specific because you're attempting to ask questions that you already know the answer to and are asking them in such a way to try to trick this witness who just drove from Michigan to be here, a significant amount of hours, at your demand, so you need to be very clear in your questions and you're not doing that today. (Wade depo. @ p. 38, line 12- p. 39, line 6).**

———

The answer after the objection:

Q.     Do you understand what I mean when I say a log?

A.     No.

Q.     Okay. Did you write down anywhere what your actual times were that you worked?

A.     I was under the assumption that was something that someone else was taking care of.

---

[7] All questions were being asked by counsel for Defendants during Wade's November 25, 2022 deposition.

Q.     So the answer is no?

**GESSNER:     Object to form.**

A.     I'm not sure. (Wade depo. @ p. 39, lines 7-15).

_____

Question and objection:

Q.     And at the end of the day, were you-- do you think you were terminated because of that write up?

**GESSNER:     Object to form. Do you mean constructive discharge because her job was threatened because she complained about how she was paid or what? I mean, again-- once again, you're not being clear in your questions to this witness. (Wade depo. @ p. 52, lines 12-20).**

_____

Question and objection:

Q.     Are you aware that documents related to your time and the time that you worked at JMJ have been produced in this case?

**GESSNER:     Object to form. Defendant did not produce documents in this case that were in total regarding this witnesses time. There were no-- just for the record, there were no video camera recordings produced, there was no time keeping information produced from JMJ. We had to go out and get it from chronotek and even that is incomplete. So it is a** false statement to this witness that you just made, Ms. Gray, that defendant produced all of **her time records and all her time keeping, it's completely false. I ask you to be thorough and accurate when you ask questions.**

_____

Question and answer after objection:

Q.     Ms. Wade, have you seen any documentation that pertains to the time, the hours, that you worked at JMJ?

A.     I don't know.

Q.     Are you aware that there has been information produced in this case regarding the hours and the time that you worked at JMJ?

**GESSNER:    Object to form. If you have information that you're referring to, show it to her so she can see it. And identify what you're calling information, as your question, again, is unclear.**
**(Wade depo. @ p. 53, line 15- p. 54, line 21).**

_____

Question and answer after the objection:

Q.      Other than what has been produced in this case, you don't have any other documentation regarding the hours that you worked?

A.      I don't know. If there are documents that are in the case, then I-- show them to me. I would be able to say yes or no, but I don't know. (Wade depo. @ p. 55, Lines 6-11).

_____

BEFORE the objection;

Q.      …so I'm just trying to clarify and understand who you're referring to.

**GESSNER:    Counsel, again, I'm making an objection. Your tone and your demeanor toward this witness is really, really, really disrespectful to her. You have-- she has told you other employees. You don't like the fact she can't give you names. What do you want her to say, they were tall, thin, male, woman, black, white? I mean, again, you're asking questions to try to get answers that you're not being clear in those questions in the first place. She has said there were other coworkers, she says it under oath in the pleading. You don't like the fact she can't give you a name and you're trying to make it seem as if it's not real, like it didn't happen, and that's incredibly inconsistent and it's incredibly harassing to this witness because you're not asking her proper questions. (Wade depo. @ p. 62, line 10- p. 63, line 8).**

_AFTER_ the objection;

Q.      16, it states, "in my communications with other employees and former employees". I'm trying to understand do you have a name of any of the other employees you spoke to?

A.      No, I don't care to remember their names.

Q.      Do you have any names of any former employees that you spoke to?

A.      I don't care to remember names. (Wade depo. @ p. 63, lines 12-19).

_____

14

When attempting to mark exhibits and question the witness about documents produced during discovery, Gessner again interrupted without even making an objection:

> **GESSNER:   And, counsel is very well aware none of the documents were Bates stamped at all in this litigation whatsoever. There is no foundation or information provided to show that this document was produced in litigation. There is no foundation whatsoever that any of these certificates that have been provided in this case, even those that were Bates stamped or not Bates stamped, were ever produced to a single witness at the time the training was conducted and counsel is well aware of that and attempting to, again, mislead the witnesses by asking these questions. (Wade depo. @ p. 68, line 17- p. 69, line 13; p. 70 lines 11-21).**

Gessner made statements in the presence of the witness that were not true, stating that she had not seen exhibits 1-15, even though the documents had been produced months earlier. (Wade depo. @ p. 67, line 14; p. 69, lines 14-21; p. 70, line 7- p. 71, line 1; p. 72, lines 3-23; p. 73, line 7- p. 74, line 10; p. 85, lines 5-18).

Gessner made a strong effort to discredit opposing counsel and create a hostile environment.

> Q.     Now, you agree that you didn't start working until February-- you didn't agree to-- I mean you didn't start working until about February 22, 2021, correct?
>
> A.     It was approximately around that time, yes.
>
> Q.     Well, I understand. I'm just looking at your affidavit. Your affidavit said beginning on or about February 22, 2021.
>
> A.     On or about.
>
> **GESSNER:   Hold on. Let me get an objection. Objection. Counsel has just marked exhibits-- what was this? Seven? Exhibits one through six show that Ms. Wade was working for JMJ on February 23, right, February 21, February 22. So, counsel, which is it? I mean, you have records in front of you that have dates that are different than what you have that you're asking her about. So do you want to clarify what you mark or are you just going to continue to try to trip her up here? That seems to be what you're doing. Put also the time punch that goes with this. Again, if you're going to put this in**

**front of her, you don't have any evidence that this reflects 31.7 hours. Where is the time punch that goes with the 31.7. If you want to ask her about when she worked, give her clock in and clock out times so that she can see it. She's not going to answer questions from her memory when you know there are documents that show otherwise. You're not going to trip her up in this deposition. So show her the comprehensive documents that you know defendant has either created or put into this case so that she can see all the evidence that the company has shown when she was performing for JMJ before the date in the declaration. (Wade depo. @ p. 77, line 23- p. 79, line 14).**

_____

Q.      …. This particular paycheck looks like it was from February 1 to February 28; would you agree with that?

A.      That's what it shows on this.

Q.      Okay. So you would have basically been paid for work for approximately 5 or 6 days for that time period, correct?

A.      I have no way of knowing that.

Q.      Well, I'm just saying if February has 28 days—

A.      You're asking me to answer a question with partial information.

Q.      Well, you understand how many days in the year February has, right?

A.      Are you insulting my intelligence? What do you mean?

Q.      I'm not trying to.

**GESSNER:   Counsel, you are. And this deposition has been nothing but that, the way you have conducted yourself-- so, to answer your question, it depends on what year it is whether there's 28 or 29 days in February. That's a prime example of you asking a question that doesn't have a thorough understanding even in the way that you ask it. And you are insulting her intelligence, just like she just said that. So it's going to stop. If you got her time records or any other evidence to confirm when she worked in the month of February, put it before her. Otherwise, she's already answered the questions. And defendants own documents show when she was allegedly working that do not add up to the 31.7 hours. In fact, it's far more than 31.7 to which she was not paid. So, counsel, where is that information that you would like to put in front of her and ask her questions about the month of February that, depending on what year it is, has either 28 or 29 days.**

16

Q.      You are more than welcome to pull out your cell phone or I can pull out mind to see if February 2021 had more than 28 days.

**GESSNER:   This witness does not have to perform for you during this deposition in any way. If you want her to look at something like a calendar, you go get one, mark it as an exhibit and show it to her. Otherwise, counsel, I know where you're going with this and you're trying to harass this witness, you're trying to insult this witness, and you're trying to elicit testimony that's completely falls on the basis of gamesmanship. So ask her thorough questions and provide her all the information that you allegedly have.**

Q.      The information that I allegedly have, which I've shown you, purports to be a pay period that began on February 21-- I mean February 1 and ended on February 28. And then I've shown you some certificates for training. My question is do you think that that training that you took during the period that's dated on their from the time you think you started until the time this pay period ended, do you think that is reflected at all in the 31.7 hours?

A.      I have no way of knowing that.

**GESSNER:   Hold on. Let the record reflect that on councils table right now at her right elbow is a document entitled employee activity detail report, dated February 1, 2021 through April 30, 2021, that has what is purported to be the punch in and punch out for this witness. And rather than show her that document so that she can add up the hours that were punched in for this time period, counsel is refusing to do that and, instead, trying to trick this witness into saying something different based upon memory when counsel has got a document right in front of her right now she's refusing to show this witness so she can get a thorough understanding and refresh her recollection as to what was happening on the job in February 2021.**

Q.      Do you Ms. Wade, think the training that you took, whether it's reflected in the certificates or not, exceeded the 31.7 hours in February?

**GESSNER:   Same objection.**

A.      I don't know. (Wade depo. @ p. 80, line 5- p. 83, line 25).

_____

When questioned about the Breach of Contract Counterclaim, Gessner continued to speak for her

client;

Q.      And it sounds like, according to the check, that it was a pay advance for April and it was written on March 25. Do you dispute that it was a pay advance for April?

17

A.      I wasn't made aware that it was for April at the time. I didn't review it that closely. I mean I just needed the money. I was needing to pay rent to get things taken care of, so I wasn't concerned with what month it was for.

**GESSNER:   And let the record reflect there is no evidence that the pay advance for April was on the check that this witness received. It could have been written on the check afterwards by Ms. Martin.**
Q.      So do you want to change your testimony on that, based on what your lawyer just said?

A.      I mean, I believe I produced a document similar to this in the case, which would have been, I assume, the original check, right?

**GESSNER:   I'm not on-- I don't have to answer any questions. But, again, this-- she's not giving you any evidence as to whether this was on the version of the check she received when she was being asked questions, when she's being asked questions. Your providing a document, it looks like, from Ms. Martin.**

A.      Yeah, I don't know. (Wade depo. @ p. 86, line 21- p. 87, line 25).

_____

Gessner also interrupted in the questioning regarding documents that had previously been signed by Wade and to instruct her on how to answer the questions;

Q.      Now, prior to today, have you seen that document?

A.      Possibly.

Q.      That your signature on the document?

A.      It looks to be.

Q.      Okay. Do you have any reason to believe that that document is false or inaccurate?

A.      Again, I don't know.

**GESSNER:   Again, let me—counsel, you continuously ask this witness if she's seen this document before today, but you do not give any context to timeframe. Did you see this document at the time you were hired by JMJ versus have you seen this document since you filed this lawsuit, two totally different time frames. And it seems like you're doing that intentionally to**

18

**mislead her so that she says something. She—you have her signature on their. Clearly, she saw the document to sign it. And it's dated February 12, 2021, again, when she was hired, completing new hire paperwork for which there is no corresponding payment of wages. So, counsel, again, ask the questions and give context to the time frame instead of misleading this witness. (Wade depo. @ p. 92, line 10- p. 93, line 12).**

_____

In many instances, Gessner would not object to the question. Rather, she would make a statement

at will. Speaking about exhibit 10;

**GESSNER:   Let the record reflect there is no date on the document. It seems defendant intentionally left the date blank because the law requires any type of repayments be provided at the time deductions are made by an employer. And it seems, once again, the defendant has chosen to play games with documents. (Wade depo. @ p. 94, lines 6-14).**

**GESSNER:   With no Bates numbers. Let the record reflect that counsel has caused-- defendant has caused extensive legal fees in this case because of failure to comply with basic rules of discovery, including indexing documents and/or Bates stamping documents, requiring manually going through each and every one, indexing them, and doing comparisons to see what has and has not been produced. So when the fee petition is high in this case, it will be because of the lack of ability to completely comply with the rules of litigation. (Wade depo. @ p. 94, line19- p. 95, line 8).**

Gessner's behavior clearly evidenced an inability to fairly and adequately represent the class.

Her conduct is sanctionable under the rules, and because any sanction imposed could

detrimentally affect the plaintiffs, she should not be appointed as counsel under Rule 23.


<u>CONCLUSION</u>

Based on the foregoing, the Plaintiffs are unable to meet their burden of proof and their

Rule 23(a) Motion should be DENIED.


This the 16th day of February, 2023.

GRAY NEWELL THOMAS, LLP.

BY:    <u>/s/ Angela Gray</u>
      Angela Newell Gray
      7 Corporate Center Court, Suite B
      Greensboro, NC  27408
      Telephone:    (336) 285-8151
      Facsimile:    (336) 458-9359
      Email: angela@graynewell.com
      *Attorney for Defendants and Counterclaim-Plaintiff JMJ Enterprises, LLC*
      NC Bar # 21006

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CIVIL ACTION NO.: 1:21-cv-00506-LCB-JLW**

| | | |
|---|---|---|
| Tiffany Wade, on behalf of herself and | ) | |
| all others similarly situated, | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| vs. | ) | *Certificate of Service* |
| | ) | |
| | ) | |
| JMJ Enterprises, LLC and Traci Martin, | ) | |
| *Defendants*. | ) | |

I, Angela Newell Gray, Attorney for the Defendants and Counterclaim-Plaintiff, do hereby certify that I filed the foregoing Memorandum in Opposition to Plaintiff's Rule 23(a) Motion with the Clerk of Court using the CM/ECF electronic filing service which will send electronic notification to the following CM/ECF participants: L. Michelle Gessner at michelle@mgessnerlaw.com.

This the 16th day of February, 2023.

Gray Newell Thomas, LLP

BY:    /s/ Angela Gray
        Angela Newell Gray
        7 Corporate Center Court, Suite B
        Greensboro, NC  27408

VERIFICATION OF COMPLIANCE WITH LOCAL RULE 7.3(d)(1)

The undersigned hereby verifies that the foregoing brief does not exceed 6,250 words.

This the 16th day of February, 2023.

<u>/s/ Angela Gray</u>
Angela Gray
N.C. Bar. No. 21006
7 Corporate Center Court, Suite B
Greensboro, NC 27408
Telephone: 336-285-8151
Facsimile: 336-458-9359
Email: angela@graynewell.com