IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CASE NUMBER: 1:21-cv-506

| | | |
|---|---|---|
| Tiffany Wade, individually, and on behalf of all others similarly situated, | ) ) | |
|     *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | *Defendants' Memorandum in Support* |
| | ) | *of their Motion for Summary Judgment* |
| | ) | *as to Counts I, II and III of the* |
| JMJ Enterprises, LLC and | ) | *Amended Complaint* |
| Traci Johnson Martin, | ) | |
|     *Defendants*. | ) | |

## STATEMENT OF RELEVANT FACTS

Defendant JMJ Enterprises, LLC ("JMJ") is a non-profit agency for at-risk children and adolescents who have a primary diagnosis of mental illness or emotional disturbance. It also serves adults who have a primary diagnosis of mental retardation/developmental disabilities and mental illness, and who are able to receive services in their own home. JMJ consists of three (3) different group homes which are all located in Greensboro, North Carolina. [ECF No. 14-1, ¶4]. Defendant Traci Martin ("Martin") has been the sole owner of JMJ since approximately 2008; however, she employs Qualified Professionals ("QP"), Program Directors, House Managers and Paraprofessionals to run the group homes. [ECF No. 78-1 @ p. 32, lines 1-4, 7-8]. Martin is responsible for developing and implementing the policies and procedures for JMJ. [ECF No. 14-1, ¶5].

The state of North Carolina requires individuals to have training on CPR, First Aid, NCI, Medication Management, and certain other specific areas prior to working in any group home setting or any other healthcare facility in the state. The state required training is voluntary and

may be obtained by an individual from various sources; however, without the training, an individual is not eligible for hire at any of the group homes run by JMJ. [ECF No. 78-1 @ p. 95, line 10-p. 96, line 14]. Individuals who have previously obtained the state required training prior to applying at JMJ are eligible to begin work in a group home immediately. [ECF No. 78-1 @ p. 96, lines 16-25; p. 97, lines 1-14].

JMJ retains third-party vendors to offer the state required training at a church near its office, and interested individuals may voluntarily take the training. JMJ pays the vendor to provide the training but does not pay the individual for taking the training. [ECF No. 78-1 @ p. 97, line 15- p. 98, line 3; p. 103, lines 5-16]. The training is for the benefit of the individual since it can be used if they come to work for JMJ, or any other entity engaged in the business. [ECF No. 78-1 @ p. 98, line 1-20]. If an individual is already employed with JMJ, JMJ does pay that employee to attend renewal training courses throughout that employee's employment. [ECF No. 78-1 @ p. 105, lines 15- 25; p. 106, line 23 -p. 107, line 1].

According to JMJ's records, Tiffany Wade ("Wade") applied for a paraprofessional position at Fresh Start on approximately February 12, 2021. [ECF No. 78-2, exhibit 8]. At the time of her application for employment with JMJ, Wade had not previously worked in the healthcare industry and therefore did not have the state required training. As a result, Wade completed the training on February 23, 2021 at the church near JMJ's offices. [ECF No. 78-2 @ p. 40, lines 2-23; depo. exhibits 1-5].[1] Thereafter, on February 25, 2021, Wade began working as a non-exempt paraprofessional at Fresh Start, with a rate of pay of $9.00 per hour. [ECF No. 78-2 @ p. 76, lines 11-13].

---

[1] The trainings included Medication Management, CPR-First Aid, Seizure Management, Bloodborne Pathogens and National Crisis Intervention Plus; and, were conducted by Amanda Eggleston, RN, BSN with the Guilford County Department of Social Services and another third-party vendor, Daryl McFarland.

2

JMJ uses a payroll company called "Payroll Solutions" which provides payroll checks to its employees based upon information gathered and submitted by the QP's working within the three (3) group homes. The QPs gather information regarding the hours worked by the employees through a time clock system called "chronotek" which records the time an employee starts and ends his/her workday. Employees are required to use the telephone at the individual group home where they are scheduled to work to call in using a pre-assigned employee number and indicate the time they commence working; and, at the end of the day, they use the same telephone to call in to indicate the time their workday ends. That information is downloaded within the chronotek system. [ECF No. 78-1 @ p. 63, line 21- p. 65, line 23; p. 86, line 18- p. 87, line 11]. There is also a time correction log which is located and maintained by the QPs at each of the various group homes which is to be used if any corrections to work hours are made. [ECF No. 78-1@ p. 198, line 15- p. 200, line 20; p. 202, line 19-25].

Wade admits that she was informed and educated by her supervisors on how to use the chronotek system, as well as the time sheet adjustments. Wade testified that she would use the chronotek system at the beginning and end of her workday, and on at least one occasion she asked Rhonda to change her time through the use of a time sheet adjustment. [ECF No. 78-2 @ p. 20-24, 30].

Shortly after beginning at JMJ, Wade asked Martin for a payroll advance of $600.00, which Martin agreed to on March 25, 2021. [ECF No. 78-2 @ p. 89, lines 20-24]. According to Martin, the advancement was given with the understanding that subsequent hours worked by Wade in April would be deducted from the advance until it was repaid. [ECF No. 78-3; ECF No. 78-2 @ p. 85, depo. exhibit 7].

On March 26, 2021, Bell texted the Fresh Start staff regarding a meeting that would take place on March 31 via ZOOM, or in-person for those who were at work at the Fresh Start group home during the time of the meeting. All staff was informed that, although the meeting was "mandatory", if they could not attend, they should let Bell know and provide reasons why they could not attend. The staff was informed that write-ups would be given for unexcused absences. The purpose of the staff meeting was to discuss staff expectations, followed by individual job performance assessments. Wade responded on March 30, 2021 that she was unable to attend and would not cancel plans she had had for over two (2) weeks. Wade did not attend the meeting on March 31, 2021. All staff who attended the meeting were paid. [ECF No. 78-4, ¶5; ECF No. 78-5, ¶5].

Wade worked at Fresh Start on April 1, 2, 3 and 4, 2021; however, on April 8, 2021 Bell received a text message from Wade stating that she was not feeling well and would be unable to come to work that day. [ECF No. 78-4, ¶9]. On April 9th, Wade texted her resignation to Martin. [ECF No. 78-5, ¶¶6,7]. Wade's payroll records indicate that she initially clocked in for work on February 25, 2021 and last clocked out on April 4, 2021. Other than standard deductions for taxes and insurances, no additional money was deducted from any of her paychecks. Likewise, the payroll records corroborate Wade's testimony that she did not work or attend a meeting on March 31, 2021. [ECF No. 14-4].

In her June 2022 Amended Complaint, Wade alleges that she, and other similarly situated employees, were not compensated for 1) working overtime hours, 2) attending mandatory meetings and 3) attending trainings in violation of the Fair Labor Standards Act ("FLSA") and the North Carolina Wage and Hire Act ("NCWHA"). Fifteen (15) former employees of JMJ,

4

who Wade alleges are similarly situated to her, consented to become Opt-In Plaintiffs in this action. They are as follows[2]:

| NO. | NAME | LOCATION | DATE EMPLOYED | HOURLY PAY |
|-----|------|----------|---------------|------------|
| 1 | Shamekia Allred-Clapp | Fresh Start | 02/18-11/20 | $10.00 |
| 2 | Tika Arnold | JGee's House | 03/20-11/21 | $8.25 |
| 3 | Marquashia Bradley | JGee's House | 02/21-05/21 | $9.00 |
| 4 | Shiquesta Brown | Fresh Start | 05/20-06/20 | $8.25 |
| 5 | Courtney Cherry | JGee's/Fresh Start | 02/20-01/21 | $10.00 |
| 6 | Sharon Cherry | Palm House | 11/20-02/22 | $8.75 |
| 7 | Anthony Fuller | JGee's House | 10/17- 11/21 | $8-$10.10 |
| 8 | Nahla Graham | JGee's Hose | 05/21-08/21 | $9.50 |
| 9 | Alex Johnson | Palm House | 05/19-11/20 | $9.00 |
| 10 | Lakita Johnson | Fresh Start | 09/20-11/20 | $7.50 |
| 11 | Amanda Johnston | JGee's | 11/21-01/22 | $10.00 |
| 12 | Alexis Levette | Palm House | 04/21-12/21 | $9.35 |
| 13 | Brandon Mapp | Palm House | 07/20-10/21 | $9.50 |
| 14 | Jennifer Russell | JGee's | 09/21 | $9.00 |
| 15 | Arianna West | Palm House | 09/21-01/22 | $10.00 |

Because neither the named Plaintiff nor the Opt-In Plaintiffs can produce sufficient evidence to support their claims against Martin and JMJ, the Defendants are entitled to judgment as a matter of law as to Counts I, II and III of the Amended Complaint.

---

[2] ECF No. 78-3, Traci Martin Declaration. Payroll records and personnel files for each of the Opt-In Plaintiffs were produced to Plaintiffs during discovery.

## STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is proper when: "(1) the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact; and (2) the moving party is entitled to judgment as a matter of law." *Von Viczay v. Thoms*, 140 N.C.App. 737, 738, 538 S.E.2d 629, 630 (2000) (quotation omitted), aff'd per curiam, 353 N.C. 445, 545 S.E.2d 210 (2001). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, see *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23–24 (D.C.Cir.2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his position— "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987) (internal quotation marks and citation omitted). Self-serving statements without supporting evidence are also insufficient to avoid summary judgment. *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004).

6

I.   <u>COUNT I OF THE AMENDED COMPLAINT SHOULD BE DISMISSED</u>

Wade alleges that on February 23, 2021, she attended a training class at a church in Greensboro with five (5) other employees where they learned First Aid, CPR and Self-Defense over a period of approximately four (4) hours without being compensated by JMJ. [ECF No. 53, ¶ 28]. That fact forms the basis of Count I of the Amended Complaint against the Defendants which alleges failure to pay minimum wages under FLSA and the NCWHA on behalf of herself, as well as the FLSA and NCWHA collective related to time spent in training. [ECF No. 53, ¶ 69].

The NCWHA and FLSA provide for recovery of an employee's unpaid wages from an "employer." N.C. Gen.Stat. § 95–25.22(a) ; 29 U.S.C. § 216(b). "The NCWHA is modeled after the FLSA." *Hyman v. Efficiency, Inc*., 167 N.C.App. 134, 137, 605 S.E.2d 254, 257 (2004) (citing *Laborers' Int'l Union of N. Am. v. Case Farms, Inc*., 127 N.C.App. 312, 314, 488 S.E.2d 632, 634 (1997) ). As such, " [i]n interpreting the NCWHA, North Carolina courts look to the FLSA for guidance." *Garcia v. Frog Island Seafood, Inc*., 644 F.Supp.2d 696, 707 (E.D.N.C.2009) ; see also *Hyman*, 167 N.C.App. at 142–49, 605 S.E.2d at 260–64 (applying federal employment case law to wage withholding and other claims brought pursuant to the NCWHA); *Laborers' Int'l*, 127 N.C.App. at 314, 488 S.E.2d at 634 (noting the NCWHA is modeled after the FLSA and relying on federal case law's interpretation of the term "employee"); *Powell v. P2Enterprises, LLC*, 786 S.E.2d 798, 247 N.C. App. 731 (N.C. App. 2016).

<u>TRAINING CLAIM BY WADE, INDVIDUALLY</u>

The facts show that Wade received certifications for Medication Management, CPR-First Aid, Seizure Management, Bloodborne Pathogens and National Crisis Intervention Plus training

on February 23, 2021. [ECF No. 78-2 @ p. 64-75, exhibits 1-5].Wade admits that she took the training at the church near JMJ's offices which was required *before* she could start working with the kids,[3] and that JMJ covered the cost of the training. [ECF No. 78-2 @ p. 40, line 2- p. 45, line 25]. This singular training class is the only instance in which Wade alleges she was not paid for attending a training class by JMJ.

JMJ argues at the outset that any training alleged in this case that was conducted prior to employment does not invoke the FLSA. FLSA requires employers to cover training for *employees* under certain circumstances. In this case, Wade could not be, and was not considered, an employee of JMJ unless and until she completed voluntary, state mandated requirements related to healthcare providers. The facts show that Wade completed the training on February 23, 2021 and her first workday was February 25, 2021.

The FLSA doesn't define the term "workday." However, federal regulations implementing the law generally provide that "an employee's workday begins with the first 'principal activity' of his employment and ends with the last such activity." 5 C.F.R. § 50.112(a). In examining the FLSA regulations, the 8th Circuit noted that the Act contemplates that a "principal activity" is a duty "which [an] employee is employed to perform." According to the court, if an employee isn't employed to perform a particular activity, even if the activity could be said to be basic to the employee's work, then it isn't a principal activity that begins or ends the workday. *Adair v. ConAgra Foods, Inc.*, 2013 U.S. App. LEXIS 18135 (8th Cir., 2013). Hence, even if Wade successfully argued that she was an "employee" for JMJ on February 23, 2021,

---

[3] The training Wade references is the state required training which, per JMJ policy, individuals are not paid to attend. [ECF No. 78-1 @ p. 284, line 13- p. 285, line 22; p. 288, line 20-p. 289, line 10]. According to Wade, Rhonda told her that she would be paid for the training but Martin corrected that misstatement and informed Wade she would not be paid before she attended the training. [ECF No. 78-2 @ p. 40-41, 42-44].

under the statute, her workday did not begin until she was sent to work at the Fresh Start Home on February 25, 2021 to commence work as a paraprofessional.

Alternatively, and *assuming arguendo* FLSA is applicable here, Wade's argument still fails. "Time spent attending employer-sponsored lectures, meetings, and training programs is *generally* considered compensable." *Chao v. Tradesmen Int'l*, 310 F.3d 904, 907 (6th Cir.2002). However, training programs are not compensable if "(a) Attendance is outside of the employee's regular working hours; (b) Attendance is in fact voluntary; (c) The course, lecture, or meeting is not directly related to the employee's job; and (d) The employee does not perform any productive work during such attendance." 29 C.F.R. § 785.27. Further, pursuant to § 785.31, "There are some special situations where the time spent in attending lectures, training sessions and courses of instruction is not regarded as hours worked. For example, an employer may establish for the benefit of his employees a program of instruction which corresponds to courses offered by independent bona fide institutions of learning. Voluntary attendance by an employee at such courses outside of working hours would not be hours worked even if they are directly related to his job or paid for by the employer."

North Carolina General Statute §131 D-10.3 requires that child-caring institutions, residential child-care facilities, group homes, maternity homes, child-placing agencies for adoption, child-placing agencies for foster care, and foster homes be licensed by the North Carolina Division of Social Services. The state of North Carolina, through Titles 9 and 10A of the Administrative Code, sets specific requirements which pertain to children's services. Among other things, it requires individuals who desire to work in the group home environment as a counselor, caregiver, paraprofessional, or qualified professional to obtain and complete specific training before being placed in a group home as an employee. [ECF No. 14-1, ¶7].

9

JMJ provides a location, outside of its offices, for a third-party vendor to teach the courses prior to allowing an applicant to work on location at one of its group homes. An applicant may voluntarily take the courses offered by JMJ at the church, or may take the courses at a location or through another vendor of his/her choosing. Further, since the courses must be completed prior to receiving a work assignment at one of the group homes, the applicant is clearly not taking the courses during work hours. There is no specific time within which an applicant must take these courses, only that they must be completed in order to be eligible for a group home assignment.

No work is performed as part of the training sessions and the courses largely pertain to safety procedures, not the actual job responsibilities of the paraprofessionals. The job responsibilities of the paraprofessionals were consistently described by Wade and the Opt-In Plaintiffs as assisting the clients with daily life activities like getting dressed, bathing, completing household chores, watching movies, chatting and preparing meals. [ECF No. 78-2 @ p. 17, lines 3-18; ECF No. 78-24 @ p. 9, line 19- p. 10, line 20; ECF No. 78-3, @ ¶10-11].

Ultimately, the compensation Wade received for attending the training classes is evidenced by her ability to own her certifications which she can use for *her* benefit in *any* healthcare employment context, irrespective of JMJ.

Based on the foregoing facts, Wade is not entitled to additional compensation from JMJ for attending pre-employment training.

MANDATORY MEETINGS CLAIM BY WADE, INDIVIDUALLY

Wade alleges in her Amended Complaint that there was one mandatory meeting on March 31, 2021 which she could attend via Zoom or in-person at Fresh Start during which employees would not be paid. [ECF No. 53, ¶ 37-41]. That fact forms the basis of Count I

Case 1:21-cv-00506-LCB-JLW    Document 109    Filed 02/26/24    Page 10 of 24

against the Defendants for failure to pay minimum wages under FLSA on behalf of herself, as well as the FLSA collective related to time associated with attending mandatory "meetings." [ECF No. 53, ¶ 70].

The facts here are clear. When Wade learned of the meeting on March 30, 2021, she responded that she was unable to attend and would not cancel plans she had had for over two (2) weeks. Wade testified that because she DID NOT attend the March 31, 2021 meeting, she did not expect to be paid. [ECF No. 78-2 @ p.49-50]. Based on Wade's own testimony, she was not entitled to compensation and her claim fails for that reason.

Even Bell's text message to Wade regarding the nature of the March 31, 2021 meeting and it's classification as "mandatory" does not invoke FLSA and NCWHA. All staff was informed that, although the meeting was "mandatory", if they could not attend, they should let Bell know and provide reasons why they could not attend. The staff was informed that write-ups would be given for *unexcused* absences, meaning employees who failed to let Bell know whether they would be present or not. All staff who attended the meeting were paid. [ECF No. 78-4, ¶5; ECF No. 78-5, ¶5].

Aside from this incident, Wade offers no other evidence of having to attend any mandatory meeting(s) during the course of her employment at JMJ.

Based on the foregoing, the FLSA and NCWHA claims related to training and mandatory meetings for Wade, individually, in Count I of the Amended Complaint should be dismissed with prejudice.

TRAINING & MEETINGS CLAIMS BY THE COLLECTIVE

The Defendants here argue that the collective did not provide sufficient representative evidence to prove that they violated the FLSA. To meet their burden under the Act, the

employees must show that they "performed work for which [they were] improperly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). Plaintiffs have offered no representative evidence of a company-wide policy that violates the FLSA through either discovery or expert statistical evidence. In fact, during the discovery phase, the collective produced responses to written interrogatories which indicate they have no evidence, beyond general speculation, of FLSA violations by JMJ. [ECF No. 78-6 through 20]. Likewise, depositions were taken of a sampling of the Opt-In Plaintiffs, and it is undoubtedly clear from the testimony of those witnesses that they have no evidence to support their FLSA and NCWHA claims. None of the Opt-In Plaintiffs identified a single meeting, or training, or shift where they worked hours in excess of their normal work hours for which they did not receive proper compensation.

For example, Tika Arnold worked as paraprofessional at JGee's House from approximately March 2020 through November 2021, earning $8.25 per hour. [ECF No. 78-21 @ p. 12, lines 9-23; p. 38, lines 18-22]. Arnold received the state required training, but could provide no details about that training. [ECF No. 78-21 @ p. 24, line 5-p. 27, line 7). She testified that mandatory meetings took place at JGee's House and were conducted by her supervisors randomly; however, she admits that she did not attend all of them and suffered no penalty for failing to do so. Again, she has no evidence regarding when these meetings occurred and she made no complaints regarding them to anyone. [ECF No. 78-21 @ p. 27, line 8- p. 30, line 25; p. 32, line 13- p. 34, line 15; p. 42, lines 8- p. 43, line 4].

Sharon Cherry worked as a paraprofessional at Palm House from November 2020 to February 2022. [ECF No. 78-22 @ p. 7, lines 13-24]. Cherry was not required to take the state required training prior to working at Palm House because she already had experience and

training which was transferable. Cherry never complained about having to attend mandatory meetings, nor for failing to be compensated for attending them, which she testified were held at Palm House and the church. [ECF No. 78-22 @ p. 12, line 23-p. 14, line 1; p. 14, lines 18-23; p. 15, line 3- p. 16, line 5].

Nahla Graham worked at JGee's House from May '21 through August '21, and testified that she was required to attend training classes at the church for which she did not receive compensation. [ECF No. 24 @ p. 28, lines 5-25; p. 33, line 18- p. 36, line 25; p. 37, lines 1-24]. However, upon review of her personnel file, Graham was in a much different situation than Wade. Graham applied for employment at JMJ on May 15, 2021 and because she already maintained valid state training certifications, she was able to start working immediately. Graham was oriented by Traci Martin with the clients at JGee's on May 15 and 16, 2021. She subsequently received renewal training through a third-party vendor for the state required training on June 9 and July 8, 2021. All of the training was documented through "chronotek" and Graham was compensated for the hours spent during this period of time. [ECF No. 78-3 @ ¶13 and attached exhibit A].

Finally, Graham testified that she was required to attend three (3) or four (4) mandatory meetings for which she was not compensated; however, she cannot recall when. She further testified that she did not complain to anyone about not being compensated for attendings these meetings. [ECF No. 78-24 @ p. 39, line 14- p. 41, line 12].

Amanda Johnston worked as a paraprofessional at JMJ between November 2021 and January 2022 earning $12.00 per hour. [ECF No. 78-25 @ p. 9, lines 20-24; p. 19, line 25- p. 20, line 3]. Johnston, unlike Wade, already had state required training from another source and was able to transfer that training to JMJ. [ECF No. 78-25 @ p. 20, lines 17- p. 23, line 18]. Further,

13

she was not required to attend any mandatory meetings. [ECF No. 78-25 @ p. 23, line 25- p. 24, line 10].

This sampling shows that there was no company-wide policy or practice which would support a FLSA or NCWHA violation, including Defendant Martin's so-called admission that some new managers were not aware that employees had to be compensated for meetings. During her deposition testimony, Martin's assertion regarding new managers was solely related to the issue pertaining to the March 31, 2021 meeting that Wade did not attend. Martin corrected that particular manager's awareness and made sure that all employees who attended the meeting were compensated. Other testimony regarding meetings is unreliable[4] and inconsistent, and does not

---

[4] In some instances, the collective's testimony was coached and directed by counsel. For example, during the deposition of Nahla Graham, her counsel made a number of speaking objections which clearly directed and influenced her testimony. Staring at page 41:
 Q. So as you sit here today, you don't have a
14 date of when the mandatory meetings occurred and you
15 don't have a date of when you would have gone to a
16 mandatory meeting and then also worked at JG House.
17 Correct?
18 MS. GESSNER: I'm going to again object to
19 form.
20 Counsel, your oppression and misleading
21 questions are over the top with this witness.
22 You are well aware that the defendant has
23 the schedules to know when Ms. Graham was scheduled
24 to work and to know when her mandatory meetings were
25 scheduled.

Page 42
1 Asking this witness, from memory, to
2 provide testimony as if she can't -- if she can't
3 give it, it didn't happen, it's just nothing but
4 misleading and oppressive.
5 If you'd like to show her the schedules
6 and show her the schedules of the mandatory meetings
7 and show her her pay stubs, to show she wasn't paid
8 for those meetings, then do that.
9 But you're asking her for information from
10 memory and asking it in a such a way to allude that
11 it doesn't exist and it didn't happen. That is the
12 definition of oppression and misleading and I'd ask
13 that you stop doing it.
14 Q. (Ms. Gray) Ms. Graham, the question that
15 I'm asking you -- I understand that you say you do

14

create a genuine issue of material fact. While at summary judgment, a court reviews the facts in a light favorable to the non-movant, speculative assertions and conclusory allegations do not establish a genuine issue of material fact. *JKC Holding Co. v. Washington Sports Ventures, Inc*., 264 F.3d 459, 465 (4th Cir. 2001).

A sampling of the collectives' testimony corroborates the ***lawful*** policies of the Defendants by showing either 1) training for uncertified applicants was pre-employment and unpaid; 2) training was renewed subsequent to employment and paid; 3) so called mandatory meetings were voluntary and those who attended were paid, and 4) no one was required to attend a meeting without pay if they were not already at work. Consequently, no FLSA or NCWHA violations occurred.

To the extent that the collective alleges that the cost of training was deducted from their pay inappropriately, neither the FLSA regulations, Fourth Circuit Court of Appeals nor North Carolina federal district court cases address deductions for the cost of training. Cases from other circuits, however, provide a rationale for allowing such a practice. The Ninth Circuit Court of Appeals, in *Gordon v. City of Oakland*, 627 F.3d 1092 (2010), held that a city's deduction of the cost of training from an employee's final paycheck was lawful. The court noted that the city could choose to require applicants to obtain their police training independently prior to beginning employment, which the city could do by hiring only individuals already possessing law enforcement certification. Instead, the city elected to make what was essentially a loan to police.

16 not recall when you had to attend a mandatory
17 meeting. Correct?
18 A. Correct.
19 MS. GESSNER : And, counsel, let me
20 be clear.
21 You are asking the question in a way as if
22 it didn't happen at all. As if her memory and her
23 prior testimony are not enough.
24 And you know that if there are documents
25 that show when she was scheduled and when she worked

15

We believe JMJ's policy here is analogous, and based on the foregoing, the FLSA and NCWHA claims of the collective related to training and mandatory meetings in Count I of the Amended Complaint should be dismissed with prejudice.

II.     COUNT II OF THE AMENDED COMPLAINT SHOULD BE DISMISSED

OVERTIME CLAIM BY WADE

Wade alleges in her Amended Complaint that on multiple occasions during her employment, she worked more than forty (40) hours in a week but was never properly compensated. Further, Wade alleges that she was not paid minimum wages and/or promised wages for all of the time worked during March and/or April, 2021. [ECF No. 53, ¶ 54-55]. Those facts form the basis of Counts II against the Defendants for alleged failure to pay minimum wages under FLSA on behalf of herself, as well as the FLSA collective. [ECF No. 53, ¶ 69].

To establish a claim for unpaid overtime wages under the FLSA, the plaintiff must establish by a preponderance of the evidence (1) that she worked overtime hours without compensation; **and** (2) that the employer knew (or should have known) that she had worked overtime but did not compensate her for it. *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986). To succeed on a claim for uncompensated overtime wages under FLSA, a plaintiff bears the burden of proving, as an element of the claim, that the employer had actual or constructive knowledge of the plaintiff's uncompensated overtime work. Fair Labor Standards Act of 1938 § 7,  29 U.S.C.A. § 207(a)(1). See *Bailey v. Cnty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996);  *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988);  *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986).

While Wade has made allegations that she worked more than forty (40) hours per week on three occasions, her math is flawed. [ECF No. 27-4]. Wade's seven (7) day workweek began

16

on Monday and ended the following Sunday, and she was paid on a monthly basis. Martin acknowledges that there was only one possible week during that period where Wade may have worked over forty (40) hours (March 2-7, 2021). However, that information was not provided to Martin until *after* this lawsuit was filed. Because staff were paid on a monthly basis, Martin did not see the weekly breakdown of hours worked by each employee. This was the role of the QPs who worked in each house. [ECF No. 78-1, @ p. 118, lines 8-23; p. 186, lines 16-22; p. 243, lines 5-19]. Wade only worked 163.60 hours for the entire month of March, 2021, which did not draw a red flag.

Furthermore, the evidence indicates that Wade never sought prior authorization for this aforementioned work or submitted overtime vouchers after it was completed. According to the Fourth Circuit opinion in *Lyle and Cubas vs. City of Fairfax Virginia*, No. 05-1134 (4th Cir. 2006) applying *Davis*, even if Wade worked overtime during the month of March, the defendant is not liable under the FSLA because it did not have knowledge that she worked overtime. See *Davis*, 792 F.2d at 1276. In *Lyle*, the appellate court affirmed the district court's summary dismissal of the FLSA claims.

Finally, any alleged overtime hours would have fallen well short of the $600.00 Wade owed to Martin. As it turns out, Wade only worked four (4) days during the month of April before she voluntarily resigned without repaying the payroll advance. [ECF No. 78-1@ p. 117, line 21- p. 118, line 7].

Based on the foregoing, Count II of the Amended Complaint as to Wade, individually, should be dismissed with prejudice.

<u>OVERTIME CLAIM BY THE COLLECTIVE</u>

"An employee who brings suit ... for unpaid minimum wages [and] unpaid overtime compensation ... has the burden of proving that he performed work for which he was not properly compensated." *Mt. Clemens*, 328 U.S. at 686–87, 66 S.Ct. 1187. However, "[t]he regulations implementing the FLSA mandate that the employer keep records of the 'hours worked each workday' by all employees." *Lee v. Vance Exec. Prot., Inc*., 7 Fed.Appx. 160, 165 (4th Cir. 2001) (argued but unpublished). Here, JMJ utilized a time recording system called "chronotek", as well as backup time adjustment sheets to keep records of hours worked by all employees. The evidence shows that the collective was fully aware of, familiar with, and utilized the chronotek and timesheet adjustment procedure to record their time.[5] Moreover, records reflecting chronotek hours, timesheet adjustments and payroll have yielded no evidence beyond conjecture that the JMJ's recordkeeping procedure was deficient in any way nor evidence of a failure to be paid for hours worked overtime.[6]

> When applying these general Rule 56 standards in this FLSA context, courts have considered the level of evidence that employees must present to create a jury question over whether they worked overtime. Generally speaking, if an employee describes a specific work schedule exceeding 40 hours, courts have found the testimony sufficient. If, by contrast, the employee testifies generically that the employee worked overtime without providing details to support this claim, courts have found that the testimony falls short.

*Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020). Here, there is no such specific testimony or evidence to support the claim of the collective. This is not an attack on the credibility of the

---

[5] [ECF No. 78-21 @ p. 13, lines 18- p. 15, line 20; ECF No. 78-22 @ p. 9, lines 5-21; ECF No. 78-22 @ p. 10, lines 3-22; ECF No. 78-23 @ p. 22, line 21-p. 23, line 22; p. 24, line 23- p. 25, line 12; ECF No. 78-24 @ p. 20-23, p. 24, lines 1-9].
[6] [ECF No. 78-21@ p. 16, lines 15-p. 19, line 7; p. 21, line 24- p. 22, line 3; ECF No. 78-22 @ p. 10, line 23- p. 11, line 20; ECF No. 78-23 @ p. 28, line 1-p. 29, line 7; p. 29, lines 8-16; p. 30, line 17-p. 31, line 6; ECF No. 78-24 @ p. 15-19; p. 19, lines 9-10; ECF No. 25 @ p. 34, line 5-p. 35, line 6; 39, lines 11- 14].

collective, but rather on the sufficiency of the evidence it creates even if accepted as true. Under the law, their evidence is insufficient to create a question of fact as to whether overtime was worked.[7]

The employer's evidence cannot be disregarded, and the collective's hollow assertions simply do not create genuine issues of disputed facts; nor do their conclusory statements raise issues of credibility. See, *e.g., Wadley v. Park at Landmark LP*, 264 F. App'x 279, 281(4th Cir. 2008) (per curiam) (concluding that a nonmovant's "own self-serving, unsubstantiated statements in opposition to [the movants'] evidence . . . is insufficient to stave off summary judgment").

Because the plaintiffs in this case seek overtime compensation during the three-year limitations period, they must establish a willful violation of the FLSA by JMJ. Plaintiff bears the burden of proving willfulness, for purposes of determining applicable limitations period in FLSA action. Fair Labor Standards Act of 1938, § 1 et seq., 29 U.S.C.A. § 201 et seq.; Portal–to–Portal Act of 1947, § 6(a), 29 U.S.C.A. § 255(a); 5 C.F.R. § 551.104. To establish a willful violation, the plaintiff "must show that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." Id. (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988) ). "The Supreme Court has specifically stated that the word 'willful' refers to conduct that is voluntary, deliberate, and intentional, and not merely negligent."

In this case, there is absolutely no evidence of a willful violation of FLSA. Martin testified that she relied on the QP's at the various group homes to provide her with information pertaining to hours worked by their staff using the chronotek and time adjustment sheet data. The policy and practice involved a presentation of that data by the QPs to Martin, who subsequently

---

[7] This argument is likewise applicable to all Counts brought by the collective against the Defendants.

19

relied on, and provided the data to Payroll Solutions. Martin was unaware of individual hours worked by any employees because she was distanced from that process most of the time. Moreover, the employees concede that they may have failed to properly record their own work hours. To make sure employees were properly compensated under such circumstances, JMJ maintained a policy and practice allowing for timesheet corrections which would ultimately be transferred to the chronotek system for accuracy. Chronotek recorded adjustments for incorrect hours, regardless of whether those hours were increased or decreased.

Because they have failed to put forth evidence of hours worked AND knowledge of willful failure to pay, the collective overtime claim should be dismissed with prejudice.

III.    COUNT III OF THE AMENDED COMPLAINT SHOULD BE DISMISSED

In this count, Wade and the collective allege Failure To Pay Wages when Due Under NCWHA. In Count III, the Court conditionally certified the NCWHA Class for issues regarding wages due for training, wages due for mandatory meetings, and wages due for improper reductions from employee time logs pursuant to N.C. Gen. Stat. § 95-25.6 and § 95-25.7. As it pertains to wages due for training and mandatory meetings, the Defendants reassert previous arguments herein.

NCGS § 95-25.8 allows an employer to take wage deductions if: (1) the deduction is one which is otherwise permitted under state or federal law; or (2) the employer obtains written authorization from the employee in the form specified by North Carolina law.

REDUCTIONS CLAIM BY WADE

The facts in the record do not indicate that Wade received any deductions related to her paychecks other than the standard deductions for federal and state taxes and insurance. This is so

even though JMJ maintained a policy of deducting cost for training. Under the FLSA and NCWHA, JMJ could have deducted such cost. Likewise, there is no evidence in the record that the chronotek records were adjusted improperly related to Wade's actual work hours. Therefore, Count III should be dismissed as to Wade, individually.

REDUCTIONS BY THE COLLECTIVE[8]

The collective's argument that deductions were made to time logs for training is largely accurate. [ECF No. 72-14 and 15]. As previously explained, JMJ deducted the "cost" of training pursuant to a company-wide policy, which was known and agreed upon in advance by all employees. The employer's payroll records indicate that of the collective, only three (3) had cost for training deducted from their pay. Again, this is in line with the company policy, and no evidence of record establishes a violation of the FLSA and NCWHA.

Next, the collective argues that deductions on the employer's chronotek records indicate "time shaving"; however, their argument lacks merit. The collective agrees that the chronotek recording system was regularly manipulated by the QPs[9] to accurately reflect individual work times. This was done through the use of time adjustment sheets. Thus, the chronotek edits do not indicate a company-wide system of shaving time. [ECF No. 72-15]. Rather, it demonstrates the company-wide system designed to correct and adjust work time as needed. Martin testified that the QPs used timesheet adjustments to correct time recording errors that may have occurred for a variety of reasons, including employees forgetting to clock in or out, mechanical mistakes with the equipment and failed internet connections. For example, Nahla Graham's timesheets had to be adjusted on May 20, 29 and 30, 2021 due to issues related to the phone lines. [compare ECF No. 72-15 @ p. 9 bottom with Exhibit A, Martin Declaration, attachment p. 1]. These and other

---

[8] The collective does not assert that the deductions for federal and state related taxes and insurance were unlawful.
[9] There were times when Traci Martin performed the role of the QP, including when a QP was out of work. During those instances, she would be identified as the employee correcting chronotek.

random or miscellaneous deductions for child support and advances are not appropriate issues for the collective. Rather, on this claim, individual issues overtake common issues. These deductions must be examined on a case-by-case basis.

Finally, the Defendants' evidence of a company-wide practice to accurately record work hours defeats the collective's time shaving claim. There is simply insufficient evidence to survive summary judgment on this Count.

<u>CONCLUSION</u>

Based on the foregoing, the Defendants motion for summary judgment as to Counts I, II and III of the Amended Complaint should be GRANTED.

This the 26th day of February, 2024.

GRAY NEWELL THOMAS, LLP.

BY:   <u>/s/ Angela Gray</u>
       Angela Newell Gray
       7 Corporate Center Court, Suite B
       Greensboro, NC  27408
       Telephone:   (336) 285-8151
       Facsimile:   (336) 458-9359
       Email:   angela@graynewell.com
       *Attorney for Defendants/Counterclaim Plaintiff*
       NC Bar # 21006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION
CASE NUMBER: 1:21-cv-506

Tiffany Wade, individually, and on            )
behalf of all others similarly situated,      )
    *Plaintiff*,                              )
                                             )
vs.                                           )          *Certificate of Service*
                                             )
                                             )
JMJ Enterprises, LLC and                      )
Traci Johnson Martin,                         )
    *Defendants*.                            )

       I, Angela Newell Gray, Attorney for the Defendants, do hereby certify that I filed the foregoing Defendants' Memorandum in Support of their Motion for Summary Judgment as to Counts I, II and III of the Amended Complaint with the Clerk of Court using the CM/ECF electronic filing service which will send electronic notification to the following CM/ECF participants: L. Michelle Gessner at michelle@mgessnerlaw.com.

This the 26th day of February, 2024.

GRAY NEWELL THOMAS, LLP.

BY:   /s/ Angela Gray
       Angela Newell Gray
       7 Corporate Center Court, Suite B
       Greensboro, NC  27408
       Telephone:   (336) 285-8151
       Facsimile:   (336) 458-9359
       Email:      angela@graynewell.com
       *Attorney for Defendants/Counterclaim Plaintiff*
       NC Bar # 21006

23

VERIFICATION OF COMPLIANCE WITH LOCAL RULE 7.3(d)(1)

The undersigned hereby verifies that the foregoing brief does not exceed 6,250 words.

This the 26th day of February, 2024.

/s/ Angela Gray
Angela Gray
N.C. Bar. No. 21006
7 Corporate Center Court, Suite B
Greensboro, NC 27408
Telephone: 336-285-8151
Facsimile: 336-458-9359
Email: angela@graynewell.com